1  **The Kozub Law Group, PLC**
   Richard W. Hundley, #19829
2  7537 East McDonald Drive
   Scottsdale, Arizona 85250
3  mewak@kozublaw.com
   (480) 624-2700
4
5  Attorneys for Defendants

6               **UNITED STATES DISTRICT COURT**

7                    **DISTRICT OF ARIZONA**

8
   | | |
   |---|---|
   | Shannon Truong, an Arizona resident,<br><br>            Plaintiff,<br><br>v.<br><br>Garden View Townhomes, LLC, an Arizona company; Franciszek Janowiak, an Arizona resident; and Elzbieta Janowiak, an Arizona resident;<br><br>            Defendants. | Case No. 2:19-CV-05398-DLR<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(Assigned to the Hon. Douglas L. Rayes)<br><br>Oral Argument Requested |

17      Defendants, Garden View Townhomes, LLC, an Arizona limited liability

18 company, and Franciszek Janowiak, bring this Motion for Summary Judgment as

19 follows:

20 **I.    THE MOTION FOR SUMMARY JUDGMENT**

21      This Motion for Summary Judgment is brought by Defendants Garden View

22 Townhomes, LLC and Franciszek Janowiak and is directed to all the counts set forth in

23 Plaintiff's First Amended Verified Complaint, filed herein on December 13, 2019.

24      Plaintiff, a long time tenant in the Garden View Townhomes located in Mesa,

25 Arizona, served for several years as an onsite property manager to assist Defendant

26 Franciszek Janowiak, owner and manager of the Garden View Townhomes complex.

27

28

1    Plaintiff has brought claims under the Fair Labor Standards Act, 29 U.S.C. § 201-
2  219 ("FLSA") and Arizona Minimum Wage Statute, A.R.S. § 23-362 through 23-364.
3  She contends she was an employee who was paid less than a minimum wage, entitling
4  her to recovery under both the FLSA, 29 U.S.C. § 206, and Arizona Statute, A.R.S. § 23-
5  364(g). She also contends she worked overtime, allegedly seven days a week, twelve
6  hours a day, and seeks overtime wages pursuant to the FLSA at 29 U.S.C. § 207.

7    An essential element of all of Plaintiff's claims is the contention she was
8  Defendants' employee. The facts show she was not. Ms. Truong entered into not one, but
9  five separate written agreements, each entitled "Independent Contractor Agreement,"
10  outlining the minimum duties required of her, that she was free to set her own work
11  schedule related to the work performed and was engaged in her own business. She is
12  consistently referred to and agreed to be considered an independent contractor. And
13  Plaintiff not only entered into these five separate agreements, she admits she was the one
14  who prepared them.

15    Further, during the latter part of 2018 when Franciszek Janowiak and his wife,
16  Elzbieta Janowiak, were involved in divorce proceedings, an outside management firm
17  was appointed by the Superior Court to manage the Garden View Townhomes. This third
18  party, Consolidated Asset Management, Inc., also known as CAM Properties, entered
19  into an agreement with Ms. Truong which confirmed her duties required no more than ten
20  hours a week, two hours a day. Ms. Truong not only agreed to and signed this agreement,
21  but she also submitted multiple time sheets in which she confirmed she only worked ten
22  hours a week.

23    Ms. Truong's position with the Garden View Townhomes ended in
24  September 2019. At a time when Mr. Janowiak was selling the Garden View
25  Townhomes, he discovered Ms. Truong had been, in effect, stealing from him. She had
26  been using his credit cards without his knowledge or consent to make many unauthorized
27  purchases and receive cash advances, all totaling in excess of $50,000. To accomplish
28

1   this scheme, she diverted the account statements to her own address and then artfully

2   revised the statements to exclude her unauthorized charges.

3        A decision as to the nature and depth of Ms. Truong's deceitful activity is not

4   relevant to the determination of this Motion for Summary Judgment. But what are

5   determinative are the multiple documents Ms. Truong not only signed, but also prepared

6   and which confirm her role as onsite property manager was that of an independent

7   contractor, precluding her from relief under the FLSA and Arizona Minimum Wage

8   Statute.

9   **II.   STATEMENT OF FACTS**

10        Garden View Townhomes, LLC was, at all relevant times herein, the owner of the

11  Garden View Townhomes, an apartment complex. Defendant Franciszek Janowiak was

12  its owner. (See Plaintiff's First Amended Verified Complaint, paragraphs 17, 18, 46 and

13  47.)

14        The Garden View Townhomes complex has twenty eight separate units. (See

15  Exhibit 2, Plaintiff's deposition excerpts, 36:8-10.)

16        Plaintiff Shannon Truong moved into the Garden View Townhomes in or about

17  October 2008. (See Exhibit 2, 9:3-14.)

18        Franciszek Janowiak was the owner and manager of the apartment complex,

19  working onsite six days a week, arriving at 4:00 or 5:00 in the morning and working into

20  the afternoon. (See Exhibit 2, 38:7-24.)

21        In May 2015, Plaintiff began providing assistance to Mr. Janowiak in the

22  management of the complex. (See Exhibit 2, 11:14-21.) The idea Plaintiff could assist

23  Mr. Janowiak was Plaintiff's, and not an arrangement proposed by Defendant. (See

24  Exhibit 2, 15:7-17.)

25        On or about May 1, 2015, the parties signed a written agreement, entitled

26  Independent Contractor Agreement. (See Exhibit 2, 18:14-18, and the referenced

27  Exhibit 1.) Plaintiff was the one who prepared the document. (See Exhibit 2, 19:4-7.)

28

The document identified Plaintiff, using her prior name of Shannon W. Gana, as Independent Contractor. It also provided in pertinent part as follows:

> 1.   The owner agrees to hire the Independent Contractor to perform the following:
>
>> a.   Show apartments when vacant.
>>
>> b.   Watch for general safety of complex.
>>
>> c.   Daily pool duties as discussed (clean, etc.). Unlock 9 a.m- close 9 p.m.
>>
>> d.   General property clean up.
>>
>> e.   Turn gate off before storm.

The Independent Contractor Agreement further provided:

> 2.   The Owner agrees to pay the Independent Contractor the following:
>
>> a.   $200 credit towards rent.
>
> 3.   The Owner acknowledges that the Independent Contractor is free to set his own work schedule.
>
> 4.   Because the Independent Contractor is engaged in his own business, the Independent Contractor is not eligible for, and shall not participate in, any employer's pension, health, or other fringe benefit plans for the client.

(See Exhibit 2, 19:11-21, and the referenced Exhibit 1.)

Plaintiff's compensation was the $200 rent credit. At the time her monthly rent was $750 to $800. (See Exhibit 2, 20:17-22.)

Ms. Truong admits she was aware of the independent contractor language she used in this agreement. (See Exhibit 2, 21:1-9.) Ms. Truong had previously worked as an office manager for A Plus Computer Services. She described her duties as follows:

> Q.   What did your duties include as office manager?
>
> A.   (By Plaintiff) Basically, running the office, answering all the calls, scheduling, accounting, payments, accounts payable and accounts receivable, payroll, and also, taking care of the boss' house and his rental property.

Q.     Were you involved in hiring employees?

A.     I was. I did the interview and then passed it on to the owner.

(See Exhibit 2, 68:5-19.)

Soon after preparing and executing the first Independent Contractor Agreement, a second Independent Contractor Agreement was prepared. It also references the start date of May 1, 2005, and is signed by both Plaintiff and Mr. Janowiak. Plaintiff is now identified as Shannon Wu in its initial paragraph. The only other change made was to increase the compensation to Plaintiff:

> 2.     The Owner agrees to pay the Independent Contractor the following:
>
> a.     Half month rent plus $100.

(See Exhibit 2, 21:10-25 and the referenced Exhibit 3.) This change was agreed to by Ms. Truong and Mr. Janowiak. (See Exhibit 2, 22:2-12.)

By mid-2016, the parties entered into a third Independent Contractor Agreement, also signed by both of them. This included a single change, again as to the compensation. The Independent Contractor's compensation was now identified as follows:

> 2.     The Owner agrees to pay the Independent Contractor the following:
>
> a.     Half month rent plus $100.
>
> b.     Free rent from August 2016.

(See Exhibit 2, 23:15-23, 24:2-9 and the referenced Exhibit 3.)

Ms. Truong's duties did not change as a result of this third agreement. Her characterization as an independent contractor, and her freedom to set her own work schedule did not change. But by August 2016, she now received full free rent, a value of about $800 a month.

In 2018, a fourth Independent Contractor Agreement was entered into by the parties. It is also entitled Independent Contractor Agreement. It references a date of August 1, 2018. The parties are Mr. Janowiak as the owner and Shannon G. Truong as

the Independent Contractor. (See Exhibit 2, 26:17-25, and the referenced Exhibit 4.) Ms. Truong admits she prepared this document in 2018. She testified she did so because the prior agreement had expired. (See Exhibit 2, 27:1-12.) In this fourth Independent Contractor Agreement, her duties only slightly changed. A new task was added:

> f.      Collect Rent, process past dues, non-compliant notices, evictions.

Her free rent as compensation was confirmed:

> 2.      The owner agrees to pay the Independent Contractor the following:
>
> a.      $619.08 credit towards rent.
>
> b.      Free rent from September 2017 to July 2018.

A fifth Independent Contractor Agreement followed. (See Exhibit 2, 32:13-25, and the referenced Exhibit 5.) It was prepared and signed in 2018. (See Exhibit 2, 32:14-18.) Ms. Truong was again its author. (See Exhibit 2, 33:1-2.) Ms. Truong again confirms she was fully aware of the independent contractor characterization she used in the document. (See Exhibit 2, 33:3-13.)

By 2018, Ms. Truong's monthly rent had increased. She testified it was $872, increasing to over $1,000 soon thereafter. (See Exhibit 2, 62:19-25.)

One of the duties included in all independent contractor agreements called for Ms. Truong to "show vacant apartments when available." She has admitted there was rarely a vacancy. (See Exhibit 2, 36:11-16.) She was also to clean the pool. She testified she cleaned the pool every two days and it would take her up to an hour. (See Exhibit 2, 41:8-24.) She would only clean the pool when Mr. Janowiak did not otherwise do so. (See Exhibit 2, 41:25, 42:1-9.)

Mr. Janowiak was the complex's manager and fully involved in its daily operations. Ms. Truong acknowledged Mr. Janowiak's work included:

> A.      (By Plaintiff) He would, if there was a repair for a tenant, he was taking care of that, if he was cleaning the pool, he was taking out the trash or repairing something on the

6

1    property, or if it was when I'm picking up trash he sometimes
     would be cleaning the pool.

2

3    Q:    So he would be cleaning the pool, picking up trash,
     and doing repairs when they were needed?

4    A:    It would vary. If there's nothing else going on, if we
5    don't have a tenant maintenance issue, he would do some
     kind of repair on the property, water issue or sprinkler issues
6    or plants or something. Sometimes he would clean the pool
     and I was picking up the trash. Most of the times when he's
7    not there, I'm the one cleaning the pool and picking up the
     trash. It varies.
8

9    (See Exhibit 2, 38:25, 39:1-15.)

10        Ms. Truong was also to collect rent payments, but only after hours when Mr.

11   Janowiak was not present to receive the rent himself. (See Exhibit 5, Defendants'

12   Answers to Plaintiff's Second Set of Requests for Non-Uniform Interrogatories, 3:3-17.)

13        Plaintiff would prepare notices when a tenant was late with rent or failed to

14   maintain his or her yard. She acknowledges this was only required two or three times a

15   month. (See Exhibit 2, 49:3-19.) She would assist Mr. Janowiak with evictions, but there

16   were only five or six evictions in the entire four plus years. (See Exhibit 2, 50:1-14.)

17        The element of the Independent Contractor Agreement which required Plaintiff to

18   "watch for general safety of complex," entailed nothing more than "walking around the

19   property during random times of the day, morning, afternoon and evenings which would

20   take about thirty minutes." (See Exhibit 2, 39:16-25, 40:1-3.) This included the "general

21   property clean up item as well. (See Exhibit 2, 43:18-25, 44:1-4.)

22        The task which required her to "turn off gate before storm" took twenty minutes

23   but was rarely required. (See Exhibit 2, 45: 4-22.)

24        Ms. Truong has also acknowledged she did not keep track of the time she spent

25   doing these duties. (See Exhibit 2, 56:17-21.)

26        Franciszek Janowiak and his wife, Elzbieta Janowiak, became involved in divorce

27   proceedings in 2018. As part of the divorce action, a third party, Consolidated Asset

28   Management, Inc., also known as CAM Properties, was retained and ordered by the

Superior Court to manage the Garden View Townhomes complex. (See Exhibit 2, 60:2-8, and Exhibit 3, excerpts of the Deposition of Jessica Green of CAM Properties, 8:12-25, 9:1.)

CAM Properties is a third-party property management company, specializing in managing multi-family properties. (See Exhibit 3, 6:6-25, 7:1-2.) Jessica Green was its principal and chief operating officer. (See Exhibit 3, 17:18-25.) She was involved in the day to day management of the Garden View Townhomes. (See Exhibit 3, 9:2-8.)

CAM Properties managed the Garden View Townhomes the months of October through December 2018. (See Exhibit 3, 11:25, 12:1-10.) It did so pursuant to a Property Management Agreement entered into with the Janowiaks (See Exhibit 3, 12:11-19, and the referenced Exhibit 1, Property Management Agreement) and approved by the Superior Court pursuant to the Order Appointing Special Master, issued September 28, 2018. (See Exhibit 1, Order.)

While managing the apartment complex, Ms. Green interacted with Shannon Truong who she understood to be the prior onsite manager. (See Exhibit 3, 14:10-12, 15:14-28.)

Ms. Green understood Ms. Truong's prior duties to include collecting rents from residents, picking up the grounds, schedule showings, and obtain applications from prospective residents. (See Exhibit 3, 15:25, 16:1-7.) CAM Properties entered into a written agreement with Ms. Truong to allow her to carry on with these duties. This written agreement is dated October 24, 2018, and was signed by Plaintiff. It included:

> 3.      As compensation for services employee shall receive $12 per hour, less mandated taxes. Employer and employee agree that ten hours is a reasonable estimate of the number of hours that employee shall work each week and that such estimate will allow employee ample time to perform all of his or her duties.

(See Exhibit 2, 60:11-20 and the referenced Exhibit 6.)

1    Plaintiff was aware of the specifics of this provision when she signed the
2  document. (See Exhibit 2, 60:25, 61:1-9.)

3    Ms. Green testified Ms. Truong's duties were the same as those previously in
4  effect. Plaintiff was to provide the following:

> Q.    . . . What were Shannon's duties once CAM Properties
> took over?
>
> A.    (By Ms. Green) She would collect rent from the
> residents, she would give it to Rosa; so it wasn't posting it in
> our system or depositing it, we did those functions for her.
> She would show any vacant units and give us applications to
> run for credit check, background check. She would pick up
> the grounds and take phone calls for prospective residents
> about moving in, she would take phone calls from current
> residents if they had a work order, and she would schedule
> the work order with vendor or one of our maintenance techs.

(See Exhibit 3, 18:25, 19:1-19.)

Ms. Green further testified as to how the ten hour amount was reached:

> Q.    Do you recall how many hours a week Shannon
> worked while CAM Properties acted as the manager?
>
> A.    I believe it was ten hours a week.
>
> Q.    And how was that ten-hour period determined?
>
> A.    By the size of the building. So typically, 28 units,
> that's what we expect the amount of work it takes for a
> manager with her duties.
>
> Q.    So this is based on your experience through CAM
> Properties?
>
> A.    Yes.

(See Exhibit 3, 21:23-25, 22:1-19.)

Ms. Green said Shannon's duties were required five days a week and should take
her no more than two hours a day. (See Exhibit 3, 22:12-19.)

1    The document entered into by CAM Properties with Ms. Truong was entitled

2  Employment Agreement, but Ms. Green considered Ms. Truong to have the duties and

3  the role of an independent contractor. (See Exhibit 3, 26:9-14.) As a result, taxes were not

4  deducted from payments made to Ms. Truong. (See Exhibit 3, 26:6-11.)

5    And while CAM Properties paid Plaintiff $12 an hour for ten hours a week, Ms.

6  Truong, at Mr. Janowiak's request, still received free rent. (See Exhibit 2, 62:11-16.)

7    Ms. Truong confirmed her two hour a day, ten hour a week time expenditure in

8  subsequent signed documents. On November 27, 2018, Plaintiff signed a time sheet

9  provided by Consolidated Asset Management, Inc. in which she indicated she worked

10  two hours a day for the period of November 8, 2018, through November 20, 2018. (See

11  Exhibit 2, 69:11-24, and the referenced Exhibit 7, Timesheet.)

12    On December 21, 2018, she signed a second timesheet, again confirming her two

13  hour a day, ten hours a week, time worked for the period of December 10 through

14  December 21, 2018. (See Exhibit 2, 71:12-17, and the referenced Exhibit 8, Timesheet.)

15    And on December 31, 2018, Ms. Truong signed a third timesheet, confirming she

16  worked two hours a day, ten hours a week for the three week period of December 10

17  through December 31, 2018. (See Exhibit 2, 75:6-17, and the referenced Exhibit 9,

18  Timesheet.)

19    Defendants terminated Ms. Truong in September 2019. (See Exhibit 2, 11:25,

20  12:1-19.)

21    Ms. Truong was terminated for misconduct. She was caught stealing from Mr.

22  Janowiak who discovered she had been using his personal credit card accounts without

23  his authorization or knowledge to make multiple purchases and obtain cash advances, all

24  totaling in excess of $50,000. These were done by Plaintiff through Mr. Janowiak's

25  Chase, Citi Business, and Discover accounts.

26    To accomplish this scheme, Ms. Truong changed the mailing address for Mr.

27  Janowiak's credit card statements, diverting them from his Garden View Townhomes

28

1   office to her apartment, Unit 15. She then falsified the statements to remove her

2   unauthorized charges and reflect only the charges Mr. Janowiak made. He would pay the

3   revised amount stated only to later learn of the unpaid balances owed. When the balances

4   were discovered, Ms. Truong offered to contact the credit card companies to contest the

5   charges. She went so far as to tell Mr. Janowiak she believed his estranged wife, Elzbieta,

6   or his son were responsible for the unauthorized charges. (See Exhibit 4,

7   Defendants'/Counterclaimants' Mandatory Initial Discovery Responses, 13:3-28, 14:1-

8   26, 15:1-9.)

9   **III.     A SUMMARY OF PLAINTIFF'S CLAIMS**

10          Plaintiff's First Amended Verified Complaint, filed December 13, 2019, includes

11   three separate counts.

12          Count One, entitled "Failure to Pay Minimum Wage – FLSA – 29 U.S.C. §206,"

13   alleges Defendants "intentionally failed and/or refused to pay Plaintiff minimum wage

14   according to the provisions of the FLSA." (See First Amended Complaint, paragraph 88.)

15   Plaintiff seeks liquidated damages pursuant to 29 U.S.C. §216 (b), additional statutory

16   damages, and attorney's fees.

17          Plaintiff's Count Two is entitled "Failure to Pay Minimum Wage – Arizona

18   Minimum Wage Statute." It similarly alleges Defendants failed to pay Plaintiff a

19   minimum wage pursuant to the Arizona Minimum Wage Statute, A.R.S. §23-362, et seq.

20   Plaintiff seeks recovery of the alleged unpaid minimum wage, doubled, and attorney's

21   fees and costs, all pursuant to A.R.S. § 23-364 (g).

22          Plaintiff's Count Three is entitled "Failure to Pay Overtime Wages – FLSA –

23   U.S.C. § 207." Plaintiff contends she worked in excess of forty hours a week throughout

24   her association with the apartment complex, May 2015 through September 2019, and

25   seeks an award of unpaid overtime as well as additional liquidated damages pursuant to

26   29 U.S.C. § 216 (b).

27

28

All of Plaintiff's claims are dependent on allegations in her First Amended Complaint by which she contends she was an employee of Defendants as defined by both the FLSA, pursuant to 29 U.S.C. § 203 (d), and the Arizona Minimum Wage Statute, A.R.S. § 23-362 (a). (See First Amended Complaint, paragraphs 11, 13, 14, and 21.) On December 23, 2019, Defendants filed Defendants' Answer to First Amended Verified Complaint. In it, Defendants denied the allegations set forth above and other essential allegations of Plaintiff's Complaint. In addition, Defendants affirmatively alleged Plaintiff was an independent contractor pursuant to the multiple Independent Contractor Agreements Plaintiff prepared and signed.

## IV.   PLAINTIFF'S MINIMUM WAGE CLAIMS FAIL BECAUSE PLAINTIFF WAS NOT DEFENDANTS' EMPLOYEE

The FLSA, at 29 U.S.C. § 203 (d), defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization."

29 U.S.C. § 206 provides "Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages" not less than a specified statutory minimum amount.

To prove a FSLA minimum wage claim, a Plaintiff must proves three elements:

(1)    Plaintiff was employed by Defendant during the period;

(2)    Plaintiff was a covered employee; and

(3)    Defendant failed to pay Plaintiff a minimum wage and/or overtime pay.

*Quinonez v. Reliable Autoglass, LLC,* No. CV-12-000452-PHX-GMS, 2012 WL 2848426, at paragraphs 1-2 (D. Ariz. July 22, 2012.)

The Arizona Minimum Wage Act is found at A.R.S. § 23-362, et seq. Under the A.R.S. §23-362 (A), an "employee" is "any person who is or was employed by an

employer but does not include any person who is employed by a parent or a sibling, or who is employed performing babysitting services in the employer's home on a casual basis."

It defines "employer" to include "any corporation, proprietorship, partnership, joint venture, limited liability company, trust, association, political subdivision of the state, individual or other entity acting directly or indirectly in the interest of an employer in relation to an employee, but does not include the state of Arizona, the United States, or small business."

A small business is defined as "any corporation, proprietorship, partnership, joint venture, limited liability company, trust or association that has less than five hundred thousand dollars in gross annual revenue and that is exempt from having to pay a minimum wage under §206 (a) of title 29 of the United States Code."

A.R.S. § 23-363 (A) requires a defined employer to pay employees no less than the minimum wage designated by statute.

Both the FLSA and the Arizona Minimum Wage statute require Plaintiff, if she is to recover a minimum wage, to be Defendants' employee. Here, through Plaintiff's own actions, her own election, and the multiple documents she signed, she confirms she was an independent contractor, and not Defendants' employee.

This is not a case where the nature of the relationship was defined by the alleged employer to be that of an independent contractor. It is not a case where we do not have documents, confirming and evidencing the relationship and the scope of duties required.

There are five separate documents signed by the parties, confirming the nature of the relationship and the duties required of Plaintiff, two in 2015, one in 2016, and two in 2018. Plaintiff admits she prepared these documents. She chose the words used. She chose the scope of her duties. Plaintiff determined herself to be an independent contractor, confirmed it the agreements she wrote and which included:

3.    The owner acknowledges that the Independent Contractor is free to set his own work schedule related to work performed.

4.    Because the Independent Contractor is engaged in his own business, the Independent Contractor is not eligible for, and shall not participate in, any employer pension, health, or other fringe benefit plans for the client.

Each Independent Contractor Agreement refers to Plaintiff as an independent contractor in eight separate places, plus the signature lines where Plaintiff signed three as the "Independent Contractor" and two as the "Contractor."

This is not a case where the relationship between the parties, or the duties required of Plaintiff, changed over the years, making Ms. Truong other than an independent contractor. This is confirmed by the subsequent Independent Contractor Agreements she prepared and signed, one in 2016 and the two in 2018. But in 2019, when the Garden View Townhomes was being sold, Plaintiff was discovered to have been wrongfully using Mr. Janowiak's credit cards to buy tens of thousands of dollars worth of goods and obtain cash advances. Ms. Truong used the independent contractor relationship not merely to obtain free rent in the apartment in which she had been living since 2007, but also to wrongfully make money by using Mr. Janowiak's credit cards. Faced with termination and possible legal ramifications, she manufactured the allegations by her Complaint, that she was an employee though she never considered herself one until she was caught and terminated.

## V.    PLAINTIFF'S OVERTIME CLAIM FAILS BECAUSE SHE AGREED SHE ONLY WORKED TEN HOURS A WEEK

Plaintiffs Count Three, seeking overtime, contends she worked more than forty hours a week to perform the duties set forth under the multiple Independent Contractor Agreements. She acknowledged in her testimony she did not keep records of the time she spent, yet alleges in her First Amended Complaint as follows:

61.    Plaintiff estimates that she worked approximately eighty four hours a week for Defendants.

1   For a three month period of time in 2018, a third party management company,
2   CAM Properties, took over operations of the apartment complex during the Janowiak's
3   divorce. Through it, a formal agreement was entered into by Plaintiff in which she
4   acknowledged the duties required of her only took ten hours a week. And she signed
5   three timesheets, covering the last three months of 2018, in which she confirmed she
6   worked two hours a day, five days a week, a total of ten hours a week, far less than the
7   forty hour threshold required under the FLSA's maximum hours limit set forth in 29
8   U.S.C. § 207 (a)(1).

9   The last three months of 2018 were not an anomaly as far as the duties required of
10  Plaintiff. Rather, the duties required of her through both the Independent Contractor
11  Agreements with Defendants and during the months CAM Properties was in charge were
12  the same. In fact, Jessica Green of CAM Properties testified based on her experience it
13  should only have taken Plaintiff approximately ten hours a week to do those duties
14  required of her.

15  And what were those duties? The five Independent Contractor Agreements are
16  clear. Very minimal duties were required of Ms. Truong.

17  She was to show vacant apartments when available. Yet, she admits there were
18  rarely any vacancies.

19  She was to watch for the general safety of the complex which consisted of walking
20  around the small twenty eight unit complex a couple of times a day.

21  She was to clean the pool but only on days when Mr. Janowiak did not clean the
22  pool. She estimates she would clean the pool perhaps every other day which would take
23  about an hour.

24  She was responsible for general property clean up, again walking the property and
25  cleaning up debris.

26  She was to turn off a gate before storms which rarely occurred.

27

28

1    And she was to collect rent, but only when the tenants paid rent while Mr.
2  Janowiak was not present. As Ms. Truong admitted, Mr. Janowiak was present six days a
3  week from very early in the morning through the afternoon. Payment would take a matter
4  of minutes. She was also to "process past dues and non-compliance notices," several
5  times a month "and evictions" which were rarely required.

6    If a triable issue of fact exists as to whether Ms. Truong was an employee or not, a
7  finding which would have to ignore the five Independent Contractor Agreements she
8  prepared, her overtime claim nevertheless fails because of the other documents she
9  signed. No reasonable trier of fact could find these tasks required over forty hours a
10  week, let alone eighty four hours a week.

11  **VI.    SUMMARY**

12    Based upon the foregoing, Defendants ask their Motion for Summary Judgment be
13  granted and Plaintiff's Complaint dismissed.

14    DATED this 21 st day of September, 2020.

15

16    THE KOZUB LAW GROUP, PLC

17

18  By: _____
         Richard W. Hundley
19         7537 East McDonald Drive
         Scottsdale, AZ 85250
20         Attorneys for Defendants

21  **COPY** of the foregoing mailed
22  this 21 day of September, 2020, to:

23  Jason Barrat
24  Zoldan Law Group, PLLC
     14500 N. Northsight Blvd., Ste. 133
25  Scottsdale, AZ 85260
     Attorneys for Plaintiff
26

27  _____
28

**Exhibits**
**Table of Contents**

1.    Order Appointing Special Master

2.    Excerpts of the Deposition of Shannon Truong

3.    Excerpts of the Deposition of Jessica Green

4.    Defendants'/Counter-Claimants' Mandatory Initial Discovery Responses

5.    Defendants' Answers to Plaintiff's Second Set of Requests for Non-Uniform Interrogatories

EXHIBIT 1

Chris DeRose, Clerk of Court
*** Filed ***
10/03/2018 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

FN 2018-091075                                                    09/28/2018

                                                        CLERK OF THE COURT
HONORABLE LAURA M. RECKART                                    L. Mitchell
                                                                Deputy

IN RE THE MARRIAGE OF
ELZBIETA JANOWIAK                          HEATHER L STEWART

AND

FRANCISZEK JANOWIAK                        DAVID N HOROWITZ


                                           JUDGE RECKART
                                           CONSOLIDATED ASSET
                                           MANAGEMENT INC
                                           301 E BETHANY HOME ROAD
                                           SUITE B-140
                                           PHOENIX AZ 85012


### ORDER APPOINTING SPECIAL MASTER

   **IT IS ORDERED** pursuant to the parties' September 25, 2018 Rule 69 Agreement, approving and adopting the *Property Management Agreement* and attached *Addendum* signed by the parties and filed by the clerk on September 25, 2018 as a formal order of the Court.

   **IT IS FURTHER ORDERED** appointing Consolidated Asset Management, Inc. as Special Master and an independent contractor to act as exclusive leasing and managing agent of the property and improvements thereon located and named as the Garden View Townhomes located at 524 South Stapley Drive Mesa, Arizona, 85204, as set forth in full detail in the formal *Property Management Agreement* signed by the parties and filed by the clerk September 25, 2018.

   **IT IS ORDERED** signing this minute entry as a formal order of the Court.

                                           /s/ Laura M. Reckart
                                           _____
                                           HONORABLE LAURA M. RECKART
                                           JUDGE OF THE SUPERIOR COURT

Docket Code 023                    Form D000D                         Page 1

TRUONG002579

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

FN 2018-091075                                                    09/28/2018

  All parties representing themselves must keep the Court updated with address changes.
A form may be downloaded at:
http://www.superiorcourt.maricopa.gov/SuperiorCourt/LawLibraryResourceCenter/

Docket Code 023                        Form D000D                        Page 2

TRUONG002580

EXHIBIT 2

1

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF ARIZONA

3

4   Shannon Truong, an Arizona          ) Case No.
    resident,                           ) CV19-5398-PHX-DLR
5                                        )
                    Plaintiff,           )
6                                        )
         v.                              )
7                                        )
    Garden View Townhomes, LLC, an       )
8   Arizona company; Franciszek          )
    Janowiak, an Arizona resident,       )
9                                        )
                    Defendants.          )
10  _____     )
    AND RELATED COUNTERCLAIM             )
11                                       )

12

13

14          DEPOSITION OF SHANNON TRUONG
              via Zoom videoconference
15
                August 19, 2020
16                12:01 p.m.

17

18

19

20  Reported by:

21  DOREEN SUTTON, RPR, CSR, CR, FAPR
    Certified Reporter
22  Certificate No. 50076

23  Prepared for:

24

25  (COPY)

SHANNON TRUONG – 8.19.2020

1                          I N D E X

2  WITNESS                                          PAGE

3  SHANNON TRUONG

4   Examination by Mr. Hundley                        5

5

6

7

8                        E X H I B I T S

9  NUMBER            DESCRIPTION                    PAGE

10  Exhibit 1         Independent Contractor
                     Agreement
11                    (Bates TROUNG000001)           17

12  Exhibit 2         Independent Contractor
                     Agreement                       21
13
    Exhibit 3         Independent Contractor
14                    Agreement
                     (Bates TRUONG02684)             23
15
    Exhibit 4         Independent Contractor
16                    Agreement
                     (Bates TRUONG002688)            26
17
    Exhibit 5         Independent Contractor
18                    Agreement
                     (Bates TRUONG002686)            32
19
    Exhibit 6         CAM Properties Employment
20                    Agreement
                     (Bates TRUONG002890-91)         60
21
    Exhibit 7         Consolidated Asset Management
22                    Time Sheet
                     (Bates TRUONG002903)            64

23

24

25

SHANNON TRUONG – 8.19.2020

1                    E X H I B I T S  (Continued)

2   NUMBER              DESCRIPTION                    PAGE

3   Exhibit 8           Consolidated Asset Management
                        Time Sheet
4                       (Bates TRUONG002904)            71

5   Exhibit 9           Consolidated Asset Management
                        Time Sheet
6                       (Bates TRUONG002905)            75

7   Exhibit 10          Discover account statement      84

8   Exhibit 11          Discover account statement      89

9   Exhibit 12          Discover account statement      91

10  Exhibit 13          Discover account statement      93

11  Exhibit 14          Discover account statement      97

12  Exhibit 15          Ink from Chase account
                        statement                       99
13
    Exhibit 16          Ink from Chase account
14                      statement                      105

15  Exhibit 17          CitiBusiness account statement 109

16  Exhibit 18          CitiBusiness account statement 113

17  Exhibit 19          Affidavit of Kay Kyle
                        (Bates TRUONG001878-80)        114
18
    Exhibit 20          Affidavit of Jeffrey Olson
19                      (Bates TRUONG000964-65)        117

20  Exhibit 21          Affidavit of Reginald Baker
                        (Bates TRUONG001881-82)        118
21
    Exhibit 22          Affidavit of Lucia Montano
22                      (Bates TRUONG000961-63)        119

23  Exhibit 23          Declaration of Cindy Jones
                        (Bates TRUONG002908-09)        120

24

25

SHANNON TRUONG - 8.19.2020

1                    DEPOSITION OF SHANNON TRUONG

2

3              The deposition of SHANNON TRUONG was taken

4    before DOREEN SUTTON, Certified Reporter No. 50076, for

5    the State of Arizona, on August 19, 2020, via Zoom

6    videoconference, commencing at the hour of 12:01 p.m.

7

8    APPEARANCES:

9    FOR THE PLAINTIFF:

10   Mr. Jason Barrat
     ZOLDAN LAW GROUP, PLLC
11   14500 North Northsight Boulevard, Suite 133
     Scottsdale, Arizona 85260
12   jbarrat@zoldangroup.com

13
     FOR THE DEFENDANTS GARDEN VIEW TOWNHOMES/FRANCISZEK
14   JANOWIAK:

15   Mr. Richard W. Hundley
     THE KOZUB LAW GROUP, PLC
16   7537 East McDonald Drive
     Scottsdale, Arizona 85250
17   rhundley@kozublaw.com

18

19

20

21

22   ALSO PRESENT:  Mr. Frank Janowiak

23

24

25

SHANNON TRUONG - 8.19.2020

1           (Deposition Exhibits Nos. 1 through 23 were

2   marked for identification.)

3

4                       SHANNON TRUONG,

5   called as a witness herein, having been first duly sworn

6   by the certified reporter, was examined and testified as

7   follows:

8

9                       EXAMINATION

10  BY MR. HUNDLEY:

11      Q.   Please state your name for the record,

12  Ms. Truong, and spell it for us.

13      A.   I'm sorry?

14      Q.   Please state your name for the record and then

15  spell it for us.

16      A.   Shannon Truong.  First name is S-H-A, double N,

17  O-N; last name, T-R-U-O-N-G.

18      Q.   Have you ever had your deposition taken before?

19      A.   I'm sorry, what was the question?

20      Q.   Are you hearing me okay?

21      A.   Well, it's just kind of echoey, I just don't

22  hear very well.

23      Q.   Have you ever had your deposition taken before?

24      A.   My job taken?

25      Q.   Your deposition.

SHANNON TRUONG — 8.19.2020

1        MR. HUNDLEY:  Is that okay with you, Jason?

2        MR. BARRAT:  That's fine.

3    Q.   BY MR. HUNDLEY:  When did you first move into

4    the Garden View Townhomes?

5    A.   I want to say October -- it's somewhere in 2008,

6    October 2008.

7    Q.   2008?

8    A.   No, I'm sorry, it was -- I don't remember.  It

9    was in 2008.

10   Q.   It was before 2015?

11   A.   Yes.

12   Q.   Approximately how many years before 2015 did you

13   move into Garden View Townhomes?

14   A.   Seven years.

15   Q.   So you did not have your son when you first

16   moved into the Garden View Townhomes; correct?

17   A.   No.

18   Q.   Has Jay always lived with you when you've lived

19   in the Garden View Townhomes?

20   A.   I'm sorry, what was the question?

21   Q.   Has your husband, Jay, always lived with you

22   when you've lived in the Garden View Townhomes?

23   A.   Yes.

24   Q.   Was there a period of time where he did not live

25   there?

SHANNON TRUONG – 8.19.2020

1          So the question is did Jay file, did your
2  husband, Jay, file a bankruptcy case before or after you
3  and he got married?
4      A.    I think he -- yes, he did.
5      Q.    Was it after you got married?
6      A.    No, it was before.
7      Q.    Have you ever been convicted of a crime?
8      A.    No.
9      Q.    Have criminal charges ever been brought against
10  you?
11     A.    No.
12     Q.    Are you currently employed?
13     A.    No.
14     Q.    Did you previously provide services to the
15  Garden View Townhomes?
16     A.    Yes.
17     Q.    When did you first begin to provide those
18  services?
19     A.    August 2015 -- no, I think it was May 2015.
20     Q.    May of 2015; is that what you said?
21     A.    Yeah.
22     Q.    Thank you.  When did you stop providing services
23  to the Garden View Townhomes?
24     A.    I'm sorry, what was that?
25     Q.    When did you stop providing services to the

SHANNON TRUONG — 8.19.2020

1    Garden View Townhomes?

2         A.    Last year.

3         Q.    2019?

4         A.    Yes.

5         Q.    Do you recall what month?

6         A.    It was October.   Sorry.

7         Q.    I didn't hear that.   There's a fight going on

8    somewhere.

9         A.    October.

10        Q.    October of 2019?

11        A.    Yes.

12        Q.    Did you cease providing services because you

13   were terminated?

14        A.    I'm sorry?

15        Q.    Did you stop providing services because you were

16   terminated?

17        A.    Yes.

18        Q.    Who terminated you?

19        A.    Frank.

20        Q.    What reason did he give for terminating you?

21        A.    He didn't tell me.

22        Q.    He didn't give you any reason?

23        A.    No.

24             MR. HUNDLEY:   I believe Frank Janowiak has

25   joined us.   Frank, can you hear me?

SHANNON TRUONG – 8.19.2020

1    Q.    Did you have any income in those years, 2015
2    through 2019?

3    A.    No.

4    Q.    What is your date of birth?

5    A.    October 7th, 1980.

6    Q.    So you're about to turn 40?

7    A.    About to.

8    Q.    Did you have a job title while you were working
9    with the Garden View Townhomes?

10   A.    Yes.

11   Q.    What was the job title?

12   A.    Property manager.

13   Q.    Who gave you that title?

14   A.    Frank.

15   Q.    Did you have a business card for your work with
16   Garden View Townhomes?

17   A.    No.

18   Q.    Did you have any, was there anything in writing
19   which identified you as the property manager of the
20   Garden View Townhomes?

21   A.    We -- I think we did at one time, we had little
22   cards that had the information about the rental
23   information and had my name on the front for the
24   potential tenants to call me back with any questions they
25   have after visiting.

SHANNON TRUONG - 8.19.2020

1      Q.    Do you still have any of those?

2      A.    I believe I do, I would just have to look for it

3   on my computer.

4      Q.    If you can find one, please provide it to your

5   attorney.

6      A.    Okay.

7      Q.    How is it you got the position with Garden View

8   Townhomes?

9      A.    I had offered to help Frank when the previous

10   manager was fired and he came to me later and offered it

11   to me.

12      Q.    So what happened first, you offered to help

13   Frank or Frank came to you and offered the position to

14   you?

15      A.    Yes, he did.

16      Q.    Which happened first?

17      A.    I offered -- I offered to help Frank.

18      Q.    Who was the previous manager?

19      A.    Bob Hainline, I think.

20      Q.    And when did he stop acting as property manager?

21      A.    I don't recall the month, but it was in 2015.

22      Q.    When you got this position with Garden View

23   Townhomes, did you consider yourself to be an independent

24   contractor?

25           MR. BARRAT:   Object to form.

SHANNON TRUONG - 8.19.2020

1           THE WITNESS:  No.

2      Q.   BY MR. HUNDLEY:  Did you consider yourself to be

3  an employee?

4      A.   Yes.

5           MR. BARRAT:  Object to the form.

6      Q.   BY MR. HUNDLEY:  Have you always considered

7  yourself to be an employee of the Garden View Townhomes

8  since May of 2015?

9           MR. BARRAT:  Object to form.

10          You may answer.

11          THE WITNESS:  Yes.

12     Q.   BY MR. HUNDLEY:  Did you ever receive any --

13  strike that.

14          I'm going to have you take a look at the first

15  exhibit, Exhibit 1, which I sent you yesterday.

16     A.   Yes.

17     Q.   Do you have that in front of you?

18     A.   Yes.

19     Q.   This is an independent contractor agreement and

20  the first line indicates May 1, 2015.  Do you see that?

21     A.   Yes.

22     Q.   Do you recognize this document?

23     A.   Yes.

24     Q.   Is that your signature in the lower right-hand

25  corner?

SHANNON TRUONG - 8.19.2020

1    A.    Yes.

2    Q.    What name did you use when you signed it?

3    A.    Shannon Wu.

4    Q.    It says "Shannon Wu Gana"; right?

5    A.    Well, no, it says Shannon Wu on here.

6    Q.    Look for the one that is in the lower right-hand

7    corner, says TRUONG000001.

8    A.    Okay.

9    Q.    Have you found it?

10   A.    Yes.

11   Q.    This was not the one you were looking at a

12   couple minutes ago?

13   A.    It was the one below it.

14   Q.    Okay, so I'll ask again.  This Exhibit 1, do you

15   recognize this document?

16   A.    Yes.

17   Q.    And did you sign it?

18   A.    Yes.

19   Q.    What name did you use when you signed it?

20   A.    Shannon Wu Gana.

21   Q.    And Gana was your maiden name?

22   A.    Yes.

23   Q.    Were you married as of May 1, 2015?

24   A.    Yes.

25   Q.    Do you know why you signed it using your maiden

SHANNON TRUONG - 8.19.2020

1   name and not your married name?

2       A.   I think I forgot to put my middle name in there,

3   so I just threw it down there.

4       Q.   Did you read this document before you signed it?

5       A.   I prepared the document.

6       Q.   You prepared the document?

7       A.   Yes.

8       Q.   So I take it, then, you also read it and was

9   familiar with its contents before you signed it?

10      A.   Yes, I went over it.

11      Q.   Does this document identify the services you

12  were to provide for the Garden View Townhomes?

13      A.   Yes.

14      Q.   And that's in section one; correct?

15      A.   I'm sorry?

16      Q.   That's in paragraph one?

17      A.   The one below the first paragraph one, yes.

18      Q.   Do you see the paragraph one?

19      A.   Yes.

20      Q.   And then it's subparts a through e?

21      A.   Yes, I see it.

22      Q.   Does this identify the compensation you were to

23  receive to perform those services?

24      A.   On line number two.

25      Q.   And what was the compensation?

SHANNON TRUONG — 8.19.2020

1    A.    That's what he said.

2    Q.    That's what Frank said?

3    A.    Yes.

4    Q.    It says "$200 credit towards rent"; correct?

5    A.    Yes.

6    Q.    So in exchange for the services that are

7  identified here, you were to receive a $200 discount on

8  your rent?

9    A.    Yes.

10    Q.    And that was acceptable to you?

11    A.    I was not -- I'm not familiar -- I was not

12  familiar what an independent contractor was.  I just -- I

13  was being just -- at the time, yes.

14    Q.    But at the time you signed this, you were

15  willing to receive a $200 rent credit; correct?

16    A.    Yes.

17    Q.    What was your rent at that time, the full amount

18  of the rent before any credit?

19    A.    I don't recall.  I think it was somewhere

20  between 750, 800, something.  I don't recall.

21    Q.    Somewhere around $750 to $800 a month?

22    A.    Somewhere in there, I just don't recall.

23    Q.    So after the credit, it would be dropped down to

24  550 to $600?

25    A.    Yes.

SHANNON TRUONG - 8.19.2020

1       Q.    Take a look at paragraph three and I'll read it,

2   it says "The owner acknowledges that the independent

3   contractor is free to set his own work schedule related

4   to work performed."

5             Do you see that?

6       A.    Yes.

7       Q.    And you knew that provision was in there when

8   you signed it?

9       A.    Yes.

10      Q.    Let's take a look now at Exhibit 2, which is, I

11  think, where you were before.   Exhibit 2 looks a lot like

12  the Exhibit 1, it has May 1st, 2015 at the top line, but

13  the signature in my Exhibit 2 is of Shannon Wu.   Do you

14  see that document?

15      A.    Yes.

16      Q.    Do you recognize this document?

17      A.    Yes.

18      Q.    And did you sign this?

19      A.    Yes.

20      Q.    Did you prepare this document as well?

21      A.    This --

22      Q.    Let me strike that.   This is identical to the

23  prior document, the Exhibit 1, but for a change on line

24  two; correct?

25      A.    Yes, this is the -- it was the same document,

SHANNON TRUONG — 8.19.2020

1   only change was Frank had modified it.

2       Q.   So paragraph two, the $200 credit towards rent

3   has been crossed off; right?

4       A.   Yes.

5       Q.   And it says "Half month rent plus $100."

6            Do you see that?

7       A.   Yes.

8       Q.   Who wrote that in?

9       A.   I did on Frank's -- I can't remember the word,

10  but Frank told me to write it down on there.

11      Q.   Frank instructed you to make that change?

12      A.   Upon Frank's instruction, yeah.

13      Q.   So, in effect, Frank was giving you kind of a

14  raise here; right?

15      A.   I'm sorry?

16      Q.   Frank was increasing the amount of the

17  compensation you were receiving?

18      A.   I'm sorry, I didn't catch that.

19      Q.   Sure.  Through this Exhibit 2, what you're

20  receiving in exchange for your services has been

21  increased from what Exhibit 1 said?

22      A.   Yeah.

23      Q.   Your rent would be cut in half, plus you would

24  receive $100?

25      A.   I never received $100, but that was -- I believe

SHANNON TRUONG — 8.19.2020

1  it was half month and then an additional hundred off.

2        Q.   But you never received the $100?

3        A.   No.

4        Q.   When was this Exhibit 2 put together and signed?

5        A.   I don't recall the date, but it was probably a

6  few months after.

7        Q.   A few months after the first one of May 2015?

8        A.   Yes.

9        Q.   Did anything happen to cause this change in what

10  you were receiving?

11        A.   I don't recall.

12        Q.   Was it Frank's idea to increase your rent

13  discount to a half month's rent?

14        A.   Yes.

15        Q.   Let's move on to Exhibit 3.  Exhibit 3 kind of

16  has a big splotch in the middle of it, we've been dealing

17  with kind of a bad original.  Exhibit 3 in the right-hand

18  corner refers to TROUNG002684.  Do you see that?

19        A.   Yeah, I see it.

20        Q.   Do you recognize this document?

21        A.   Yes, same one as the first one.

22        Q.   And did you sign it?

23        A.   Yes.

24        Q.   This one also has a change to paragraph two;

25  correct?

SHANNON TRUONG - 8.19.2020

1    A.    Yes.

2    Q.    What is the change that has been made?

3    A.    Free rent from August 2016.

4    Q.    So that's in paragraph 2.b.?

5    A.    Yes.

6    Q.    So by August 2016, instead of receiving a

7    partial rent credit, you're now getting a full rent

8    credit; correct?

9    A.    Yes.

10    Q.    Do you recall what your rent was in the summer

11    of 2016 before the credit?

12    A.    I don't recall.

13    Q.    Are you the one who wrote in the free rent from

14    August 2016 entry?

15    A.    No.

16    Q.    Who did?

17    A.    Frank.

18    Q.    You wrote in the line above it, "Half month rent

19    plus $100," though; right?

20    A.    That was on Frank's instruction.

21    Q.    And then 2.b. where it says "Free rent from

22    August 2016," that's Frank's writing?

23    A.    Yes.

24    Q.    Do you know about when this document was put

25    together?

SHANNON TRUONG - 8.19.2020

1    Q.    When did it become a full-time job?

2    A.    I'm sorry?

3    Q.    When did it become a full-time job?

4    A.    Instead of doing -- just doing the job part of

5    the morning, I end up having to be on the property all

6    day.

7    Q.    Was there a period in time where it had changed

8    and you had to be on the property all day?

9    A.    Yes.

10   Q.    When was that?

11   A.    It changed a few months after I signed the

12   renewal contract.

13   Q.    So a few months after May 2015?

14   A.    Yes.

15   Q.    Let's next turn to Exhibit 4.

16   A.    I'm sorry?

17   Q.    Exhibit 4, it's another independent contractor

18   agreement, and on the first line it refers to August 1,

19   2018.

20   A.    Yes, I see it.

21   Q.    Do you have that one?  Do you recognize that

22   document?

23   A.    Yes.

24   Q.    Did you sign it?

25   A.    Yes.

SHANNON TRUONG - 8.19.2020

1     Q.    Who prepared this document?

2     A.    I did.

3     Q.    I'm sorry, what was that?

4     A.    I did.

5     Q.    Do you know when this document was signed?

6     A.    I'm sorry?

7     Q.    Do you know when this document was prepared and

8  signed?

9     A.    I don't recall.  It was just in around 2018.

10     Q.    Do you know why this document was prepared?

11     A.    I believe because of the previous document

12  expired.

13     Q.    So this in paragraph one, again, identifies the

14  work you're going to do; right?

15     A.    I'm sorry?

16     Q.    Paragraph one of this exhibit identifies the

17  work that you're going to do?

18     A.    Yes.

19     Q.    And it looks like a new item has been added,

20  paragraph f, which says "Collect rent, process past dues,

21  noncompliant notices, and evictions."

22           Do you see that?

23     A.    Yes.

24     Q.    So is that something you started doing around

25  August 2018?

SHANNON TRUONG - 8.19.2020

1    A.    It was September 2017.

2    Q.    So you went to Housing and you got some rental

3    assistance?

4    A.    Yes.

5    Q.    And did you turn that over to Frank?

6    A.    He picked it up from them, yes.

7    Q.    Do you know how much it was each month?

8    A.    I can only recall it was the amount equal to one

9    month's rent without discount.  So with the discount, it

10   paid two months.

11   Q.    I got it.  Was that the only time that you got

12   some allowance from an assistance agency?

13   A.    Yes, it was the only time.

14   Q.    It didn't go on and on, it was just for that one

15   period of time?

16   A.    It was just that one time.

17   Q.    Take a look at the next exhibit, Exhibit 5.

18   This is an independent contractor agreement and the first

19   line refers to the 1st day of January 2018 to 31st of

20   December 2018.  Do you see that?

21   A.    Yes.

22   Q.    And do you recognize this document?

23   A.    Yes.

24   Q.    Did you sign it?

25   A.    Yes.

SHANNON TRUONG - 8.19.2020

1    Q.    Are you the one who prepared it?

2    A.    Yes.

3    Q.    So you knew that in all these agreements, you're

4  referred to as an independent contractor; is that

5  correct?

6    A.    I'm sorry?

7    Q.    You knew that each of these agreements referred

8  to you as an independent contractor?

9    A.    I don't understand the question.

10    Q.    You knew that these agreements that we've looked

11  at, Exhibits 1 through 5, each refer to you as an

12  independent contractor?

13    A.    Yes.

14    Q.    What was the purpose -- strike that.

15          When was that Exhibit 5 prepared and signed?

16    A.    This was signed in 2018.

17    Q.    2018?

18    A.    This was signed in 2018.

19    Q.    Was it signed at the start of the year?

20    A.    No, I'm sure this was sometime -- I actually

21  don't recall what month.

22    Q.    Do you know what the purpose of this agreement

23  was?

24    A.    It was an update and this was, like -- this was

25  used for -- during for Frank's -- during Frank's divorce.

SHANNON TRUONG - 8.19.2020

1   when available."

2          Do you see that?

3   A.    Yes.

4   Q.    Was this one of your duties?

5   A.    I'm sorry?

6   Q.    Was this one of your duties as the manager?

7   A.    Yes.

8   Q.    How many units are there in the Garden View

9   Townhomes complex?

10  A.    Twenty-eight.

11  Q.    How often was there a vacancy?

12  A.    Rarely; during my employment, maybe one every

13  few months.

14  Q.    So you said rarely at first?

15  A.    It was rarely, because we didn't have a vacancy

16  every month, it was one every few months.

17  Q.    So how many times in the average year would you

18  show an apartment to possible new tenants?

19  A.    I practically showed apartments almost every day

20  for potential tenants, I showed my apartment.

21  Q.    But you said it was rarely that there was a

22  vacancy?

23  A.    Rarely a vacancy, but because of Frank, he has

24  me stay on the property every day in case there was a

25  potential tenant coming looking for rent, I have to be

SHANNON TRUONG — 8.19.2020

1     A.    No.

2     Q.    -- to tenants?

3     A.    No.

4     Q.    Was Frank involved in the management of the

5  Garden View Townhomes?

6     A.    What?  I'm sorry.

7     Q.    Was Frank involved in the management of the

8  Garden View Townhomes?

9     A.    Maintenance?

10    Q.    At all in the management; let me ask it again.

11          Was Mr. Janowiak involved in the ongoing

12 management of the Garden View Townhomes?

13    A.    Yes.

14    Q.    Did he have a title?

15    A.    Owner.

16    Q.    How many days a week would he come to the

17 apartment complex?

18    A.    Six days a week.

19    Q.    What time of day would he normally arrive?

20    A.    Usually 4:00, 5:00 in the morning.

21    Q.    And when would he leave?

22    A.    Depending on that day, he could either be here

23 until 11:00 or if we have something going on, he would

24 stay until later in the afternoon.

25    Q.    What work would he do when he was at the

SHANNON TRUONG - 8.19.2020

1  complex?

2       A.    He would, if there was a repair for a tenant, he

3  was taking care of that, if he was cleaning the pool, he

4  was taking out the trash or repairing something on the

5  property, or if it was when I'm picking up trash he

6  sometimes would be cleaning the pool.

7       Q.    So he would be cleaning the pool, picking up

8  trash, and doing repairs then they were needed?

9       A.    It would vary.  If there's nothing else going

10  on, if we don't have a tenant maintenance issue, he would

11  do some kind of repair on the property, water issue or

12  sprinkler issues or plants or something.  Sometimes he

13  would clean the pool and I was picking up the trash.

14  Most of the time when he's not there, I'm the one

15  cleaning the pool and picking up the trash.  It varies.

16       Q.    Let's see, section b under the list of work says

17  "Watch for general safety of complex."

18             Do you see that?

19       A.    Yes.

20       Q.    Was this one of your duties?

21       A.    Yes.

22       Q.    What did it entail?

23       A.    Walking around the property during random times

24  of the day, morning, afternoon, and evenings.

25       Q.    About how long would it take you to walk around

SHANNON TRUONG - 8.19.2020

1  the property?

2      A.   Without any distraction from a tenant, possibly

3  about 30 minutes.

4      Q.   And how many times a day would you do it?

5      A.   Multiple times a day.

6      Q.   Multiple?

7      A.   Yes.  I would walk, check the mail, look around,

8  at night check the lights, walk around; it would just be

9  in and out.

10     Q.   Would you choose what time of day to do the

11  walk-around?

12     A.   It was more like a schedule, it would be morning

13  and some part of the evening.

14     Q.   Sometime in the morning, sometime in the

15  afternoon or evening?

16     A.   It would always be in the morning and

17  afternoons, and then depending on if I had dinner or not,

18  I would go out and walk.

19     Q.   But there was no set time, you just did it

20  sometime during those parts of the day?

21     A.   The evening is not set, morning and afternoon

22  has to always be done.

23     Q.   What time in the morning would you do it?

24     A.   When I get up, around 6:00, 7:00 o'clock,

25  picking up trash.

SHANNON TRUONG - 8.19.2020

1    Q.    Would you do it by yourself or with Frank?

2    A.    By myself.

3    Q.    What time would you do it in the afternoon?

4    A.    Usually after he leaves.

5    Q.    When you would do it in the morning, Frank was

6    already there at the complex; right?

7    A.    Yes.

8    Q.    Item c then says "Daily pool duties as

9    discussed," paren, "clean, etc.," closed parens, "open

10   10:00 a.m. to 9:00 p.m., close varies."

11         Do you see that?

12   A.    Yes.

13   Q.    This was also one of your duties --

14   A.    Yes.

15   Q.    -- you were to clean the pool?

16   A.    Yes.

17   Q.    Did you do it every day?

18   A.    It was cleaned when it needed to be cleaned.  If

19   it was clean already, it needed to be cleaned, we would

20   check for chemicals and check the pool to make sure there

21   was no maintenance issue.  Cleaning the pool was done

22   every two days.

23   Q.    Every two days?

24   A.    Every two days.

25   Q.    Would Frank also clean the pool?

SHANNON TRUONG - 8.19.2020

1     A.    Yes.

2     Q.    So in the normal week, how many days would you

3  clean the pool?

4     A.    When we cleaned the pool, it's every two days.

5  Frank will clean it whenever he wants.  So even if I

6  cleaned it, he would clean it again.

7     Q.    Well, you wouldn't both clean it the same day,

8  would you?

9     A.    Not the same day, no.

10     Q.    Was there any discussion between you and Frank

11  as to who was going to clean the pool on a certain day?

12     A.    No, just clean it when it looks dirty and needs

13  to be clean, clean it.

14     Q.    So you would clean it when it needs it and you

15  said that's, like, every other day?

16     A.    It would be like that.

17     Q.    But Frank also might be cleaning it as well?

18     A.    Yes.

19     Q.    When you did clean the pool, how long did it

20  take you?

21     A.    About an hour or so.

22     Q.    Were the pool hours for the tenants 10:00 a.m.

23  to 9:00 p.m.?

24     A.    Yes.

25     Q.    That's what this entry refers to?

SHANNON TRUONG - 8.19.2020

1    A.    Yes, open the pool after we clean the pool, open

2    it exactly at 10:00 a.m. and leave it open until

3    9:00 p.m., so...

4    Q.    What did opening the pool involve?

5    A.    After we clean the pool over, go over to the

6    pool and take the padlock off so tenants can use their

7    key.

8    Q.    It was behind a locked gate?

9    A.    It was padlocked.

10   Q.    So you would unlock it at 10:00 a.m.?

11   A.    Yes.

12   Q.    Would Frank ever unlock the pool at 10:00 a.m.?

13   A.    Sometimes he would.

14   Q.    And then you would lock the gate at 9:00 p.m.?

15   A.    Yes.

16   Q.    Is that every day?

17   A.    Every day.

18   Q.    Section d says "General property cleanup."

19         Do you see that entry?

20   A.    Yes.

21   Q.    Was this one of your duties?

22   A.    Yes.

23   Q.    What did this involve?

24   A.    Walking around, picking up trash in the morning,

25   and during one of my walks around the property, if I see

SHANNON TRUONG - 8.19.2020

1  any trash, pick it up; if there's any cleanup.

2      Q.   So this is similar to section b, watching for

3  the general safety of the complex?

4      A.   Basically, yes.

5      Q.   So it's walking around a few times a day,

6  cleaning things up, maybe stopping cat fights and dog

7  fights?

8      A.   Yeah.  I need to put my dog somewhere.

9           MR. HUNDLEY:  Just in case the record might look

10  weird in print, there's sounds of a couple of animals not

11  getting along.

12      Q.   BY MR. HUNDLEY:  Item e then says "Turn gate off

13  before storm."

14           Do you see that?

15      A.   Yes.

16      Q.   That was one of your duties?

17      A.   Yes.

18      Q.   What gate is this referring to?

19      A.   It refers to the front entrance.  Anytime there

20  is a storm or likely looks like we're going to have a

21  storm, lightning, it could cause a blackout in the area,

22  so the front gate would be locked shut.  So if I see that

23  we're going to have a storm, a rainstorm, thunderstorm, I

24  would go out even at night before it -- at night when I

25  know I see it; sometimes I don't know if there's going to

SHANNON TRUONG - 8.19.2020

1  be rain that day, but later at night we see rain or

2  lightning, I run out to the front gate and I open it and

3  lock it open so it will not stay closed.

4      Q.   How long would it take you to turn the gate off?

5      A.   The gate -- the gate switch is a little tricky,

6  so it would take me 20, 30 minutes to get it open and

7  stay open.

8      Q.   It would take you 20, 30 minutes to turn it on

9  or off?

10     A.   Sometimes the switch is finicky, you turn it off

11 and it's supposed to open, but it doesn't open, so you

12 play with the switch until you get the gate open.

13     Q.   Was the switch ever fixed?

14     A.   I'm sorry?

15     Q.   Was the switch ever fixed?

16     A.   It would work, but it's just -- I don't know

17 why, it would just be finicky.

18     Q.   How often in a normal month would you have to

19 turn the gate off because of a possible storm?

20     A.   At least once or twice, once a month if that;

21 when we get to monsoon season, then that would be at

22 least twice a month.

23     Q.   Item f says "Collect rent, process past dues,

24 noncompliant notices, evictions."

25          Do you see that?

SHANNON TRUONG — 8.19.2020

1   of the collecting of the rent duties?

2       A.   Yes.

3       Q.   Then it says "noncompliant notices."  What does

4   that refer to?

5       A.   Many things.  If Frank sees a tenant's backyard

6   grass are really high, I have to leave a noncompliant

7   notice on the door to please cut the grass.  Or if

8   someone's parking in an area he did not want them to be

9   parked at, I have to leave them a noncompliant notice.

10  If there was an issue he had with a tenant with a dog or

11  noise or generally, any issue he has with a tenant, I

12  have to post a noncompliant notice on their door.

13      Q.   Who would write the notice?

14      A.   Me.

15      Q.   And then you'd post it on the door?

16      A.   If they don't answer the door.

17      Q.   How often in a typical month did you have to

18  post a noncompliant notice?

19      A.   Two, three times a month.

20      Q.   Then it refers to evictions.  Was that also part

21  of your duties?

22      A.   Yes.

23      Q.   To what extent were you involved in evictions?

24      A.   Frank would help, Frank would be in for the

25  evictions.

SHANNON TRUONG - 8.19.2020

1    Q.    Frank would do the evictions?

2    A.    I prepare for the eviction and on the day of

3    court, we both go.

4    Q.    You actually went to the court hearings?

5    A.    I'm sorry?

6    Q.    You went to the court hearings?

7    A.    Yes.

8    Q.    How often would you go to a court hearing?

9    A.    Just about once every few months, depending.

10   Q.    So over the four years or so where you were

11   working as the onsite manager, do you have an estimate of

12   the number of times you went to a hearing?

13   A.    I would say we did evictions, I believe -- I

14   believe five or six times.

15   Q.    Who would prepare the legal papers, the

16   complaint?

17   A.    Me.

18   Q.    Did you also turn any tenants over to collection

19   companies?

20   A.    Yes.

21   Q.    How often would that happen?

22   A.    Each -- well, for every eviction if they don't

23   pay.

24   Q.    So maybe the five or six times?

25   A.    For the evictions, yes, five, six times.  For

SHANNON TRUONG - 8.19.2020

1       A.    Yes.

2       Q.    Did Frank ever say you needed his permission to

3  leave the property?

4       A.    No, he never said.  If I brought something up,

5  say, for example, I have a doctor's appointment next week

6  he would say oh, okay, that's fine.  But then he would

7  say how long will it take, when will you be back, you

8  need to answer your phone, I need you here.

9       Q.    About how many hours in the average week were

10  you actually doing the work, the items that we went over

11  from the independent contractor agreement; not being on

12  call, just the pool or walking around or cleaning things

13  up, about how many hours a week?

14      A.    About four, five hours.

15      Q.    Four, five hours a week?

16      A.    A day.

17      Q.    Did you keep track of your time?

18      A.    No.

19      Q.    Did you do time sheets that you would give to

20  Frank?

21      A.    No, Frank never gave me time sheets to fill out.

22      Q.    Did you ever tell Frank that you were working

23  more than 40 hours a week?

24      A.    I didn't think I needed to, Frank just knew

25  where I was.

SHANNON TRUONG - 8.19.2020

1    and get mad, say why are you doing this.

2         Q.    Did an outside management company at some point

3    take over management of the Garden View Townhomes?

4         A.    Yes.

5         Q.    What year was that?

6         A.    2018.

7         Q.    Was that as CAM Properties?

8         A.    Yes.

9         Q.    Take a look at Exhibit 6.

10        A.    Okay.

11        Q.    This is a two-page document that says "CAM

12   Properties Employment Agreement."

13              Do you see that?

14        A.    Yes.

15        Q.    Have you seen this before?

16        A.    Yes.

17        Q.    Did you sign it on page two?

18        A.    Yes.

19        Q.    Did you read it before you signed it?

20        A.    Yes.

21        Q.    So here this says that you're going to be

22   employed by CAM Properties and you're going to be paid

23   $12 an hour; is that correct?

24        A.    That's what they told me, yes.

25        Q.    And then it says "Employer and employee agree

SHANNON TRUONG - 8.19.2020

1  that ten hours is a reasonable estimate of the number of

2  hours that employee shall work each week and that such

3  estimate will allow employee ample time to perform all of

4  his or her duties."

5       Do you see that?

6  A.  Yes.

7  Q.  Were you aware that was in there when you signed

8  it?

9  A.  Yes.

10  Q.  Do you think that was a reasonable estimate of

11  the hours that would be required of you?

12       MR. BARRAT:  Object to form.

13       THE WITNESS:  That is what the CAM Properties

14  told me to put on there.

15  Q.  BY MR. HUNDLEY:  Did you agree that that's a

16  fair number of hours?

17  A.  I didn't have any say.  They said you need to

18  put this because the Department of Labor -- I needed to

19  sign an employment agreement with them, they did not want

20  to get in trouble, and she just -- the lady told me to

21  put this on there, which we were just going to pay you

22  this, and she just -- and I said okay, because I did not

23  want to get in trouble.

24  Q.  Well, you could have told them no; right?

25  A.  I'm sorry?

SHANNON TRUONG - 8.19.2020

1    Q.    You could have told them no?

2    A.    I could have, but then that means that Frank

3    would lose me on the property during his divorce.  He

4    wanted me on the property instead of -- his wife did not

5    want me on the property during their divorce, but he

6    wanted me on the property so he could still maintain

7    control of the property instead of the actual management

8    company.  So if I was still here they had to work with

9    me, so Frank would still get what he wants done because I

10   was here.

11   Q.    When CAM Properties was managing the complex,

12   were you paying rent?

13   A.    No.

14   Q.    And do you know why you were not paying rent?

15   A.    Frank told me he told them I'm not paying rent,

16   but he did ask me to pay him $200.

17   Q.    We talked about that before, you paid that?

18   A.    Yes, he still asked me to pay this again later.

19   Q.    What would the rent have been for your apartment

20   in 2018 if you were paying rent?

21   A.    My rent was 872.

22   Q.    What is the rent now that you're paying?

23   A.    My rent is 1,040.

24   Q.    1,040?

25   A.    Yes.

SHANNON TRUONG - 8.19.2020

1    exchange for payment?

2        A.    Family members.

3        Q.    They paid you for it?

4        A.    Sometimes.

5        Q.    You were the office manager with the storage

6    company -- I'm sorry, you were the office manager with

7    Space Savers?

8        A.    No, I was administrative assistant with Space

9    Savers.

10       Q.    Who were you the office manager with?

11       A.    A Plus Computer Services.

12       Q.    What did your duties include as office manager?

13       A.    Basically, running the office, answering all the

14   calls, scheduling, accounting, payments, account payable

15   and account receivable, payroll, and also, taking care of

16   the boss's house and his rental property.

17       Q.    Were you involved in hiring employees?

18       A.    Part, I was.  I did the interview and then

19   passed it onto the owner.

20       Q.    Did that A Plus Computer have any independent

21   contractors?

22             MR. BARRAT:  Object to form.

23             You may answer.

24             THE WITNESS:  No.

25       Q.    BY MR. HUNDLEY:  Do you have an understanding as

SHANNON TRUONG — 8.19.2020

1   to why Frank terminated you from the Garden View

2   Townhomes position?

3       A.    He never told me.

4       Q.    Do you have an understanding as to why?

5       A.    My assumption is because he sold the property.

6       Q.    Did Frank ever tell you that he thought you had

7   been stealing from him?

8             MR. BARRAT:   Object to form.

9             You may answer.

10            THE WITNESS:   No.

11      Q.    BY MR. HUNDLEY:   Let's take a look at Exhibit 7.

12   Exhibit 7 is a time sheet and in the lower right-hand

13   corner it has the date of November 27, 2018.

14      A.    Okay.

15      Q.    Do you have it?

16      A.    Yes.

17      Q.    Have you ever seen this document before?

18      A.    Yes.

19      Q.    Did you sign it?

20      A.    Yes.

21      Q.    Are the contents of this document accurate?

22      A.    I'm sorry?

23      Q.    Are the contents of this document accurate?

24      A.    Yes.

25      Q.    What does this document reflect?

SHANNON TRUONG - 8.19.2020

1    A.    (No verbal response.)

2    Q.    Is that yes?

3    A.    Yes.

4    Q.    Shannon Wu is your married name?

5    A.    Yes.

6    Q.    Where does Shannon Truong come about?

7    A.    My previous marriage.

8    Q.    Oh, okay.  When did that marriage end?

9    A.    I'm sorry?

10   Q.    When was that marriage over?

11   A.    Twenty years ago.

12   Q.    Twenty years ago, okay.  Let's take a look at

13   Exhibit 8 next.  This is another time sheet, this one's

14   dated December 21, 2018.  Do you recognize this document?

15   A.    Yes.

16   Q.    Did you sign it?

17   A.    Yes.

18   Q.    And did you fill it out?

19   A.    Under the instructions, yes.

20   Q.    Are the contents accurate?

21   A.    That's what they told me to do, yes.

22   Q.    So you say they told you to fill it out and to

23   show that you worked two hours a day?

24   A.    They told me I needed to -- because they were

25   paying me ten hours a week, I had to put two hours each

SHANNON TRUONG — 8.19.2020

1   Liz or the other woman, that you were working more hours

2   and should get paid for those hours?

3        A.    I did not question them, because the -- this was

4   all tied into Frank's divorce and I did not want any

5   trouble.

6        Q.    Let's look at Exhibit 9, which is similar to

7   what we just looked at.   This time sheet, the date is

8   December 31, 2018; do you see that document?

9        A.    Yes.

10       Q.    And did you sign it?

11       A.    Yes.

12       Q.    And again, this shows you working every day,

13   maybe every weekday, from 8:00 a.m. to 10:00 a.m.;

14   correct?

15       A.    Yes.

16       Q.    Two hours a day; correct?

17       A.    Yes.

18       Q.    And you signed this because somebody with CAM

19   Properties said you needed to sign it and fill it out

20   this way?

21       A.    Yes.

22       Q.    But you signed it even though you were working

23   four or five hours a day?

24       A.    Yes.

25       Q.    I don't know if I asked you this or not:   Did

SHANNON TRUONG - 8.19.2020

1   STATE OF ARIZONA        )
                            )  ss.
2   COUNTY OF MARICOPA      )

3       BE IT KNOWN that the foregoing proceedings were
    taken before me; that the witness before testifying was
4   duly sworn by me to testify to the whole truth; that the
    foregoing pages are a full, true, and accurate record of
5   the proceedings, all done to the best of my skill and
    ability; that the proceedings were taken down by me in
6   shorthand and thereafter reduced to print under my
    direction.

7

        I CERTIFY that I am in no way related to, nor
8   employed by any of the parties hereto, and have no
    interest in the outcome thereof.

9

        [X] Review and signature was requested.
10          Review and signature was waived.
            Review and signature not requested.

11

        I CERTIFY that I have complied with the ethical
12  obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
    J(1)(g)(1) and (2).  Dated at Scottsdale, Arizona, this
13  1st day of September, 2020.

14

15

16              _____
                      DOREEN SUTTON, FAPR, CSR
                       Certified Reporter #50076
17                   Registered Diplomate Reporter

18              *       *       *       *       *       *

19

20      I CERTIFY that DS REPORTING, LLC, has complied with
    the ethical obligations set forth in ACJA
21  7-206(J)(1)(g)(1) through (6).

22

23

24              _____
                         DS REPORTING, LLC
                      Registered Reporting Firm
25                    Arizona RRF No. R1042



EXHIBIT  I
Truong
8.19.2020
Doreen Sutton CR 50076

## Independent Contractor Agreement

THIS AGREEMENT, entered into this the **1st** day of ____**MAY**_____, 2015, by and between Franciszek Janowiak, owner of GardenView Townhomes LLC, in Mesa, Arizona, and _*SHANNON  WU GANA*_____ (Independent Contractor) of Mesa, Arizona.

FOR AND IN CONSIDERATION OF the mutual promises and benefits of the parties, they do hereby agree to the following:

1. The owner agrees to hire the Independent Contractor to perform the following:
   a. Show apartments when vacant.
   b. Watch for general safety of complex.
   c. Daily pool duties as discussed (clean, etc.). Unlock 9am-close 9pm.
   d. General property cleanup.
   e. Turn gate off before storm.

2. The owner agrees to pay the Independent Contractor the following:
   a. $200.00 credit towards rent.

3. The owner acknowledges that the Independent Contractor is free to set his own work schedule related to work performed.

4. Because the Independent Contractor is engaged in his own business, the Independent Contractor is not eligible for, and shall not participate in, any employer pension, health, or other fringe benefit plans for the client.

5. The Independent Contractor agrees to complete the work to be performed in a manner generally acceptable to the industry in which he/she is being employed. If they parties have agreed to any specification with regard to the job, they have attached said specification as an addendum to this Agreement.

6. The Independent Contractor agrees to indemnify and hold the owner harmless from any claim or liability arising from the work provided by the Independent Contractor.

7. Any changes or addition to this contract shall be in writing and signed by all parties.

8. This contract shall be governed by the laws of the state of Arizona.

FRANCISZEK  JANOWIAK
Name of Owner

Signature of Owner

SHANNON  WU GANA
Name of Independent Contractor

Signature of Independent Contractor

TROUNG000001

EXHIBIT  2
Truong
8.19.2020
Doreen Sutton CR 50076

## Independent Contractor Agreement

THIS AGREEMENT, entered into this the 1ᵀ day of _MAY_____, 2015, by and between Franciszek Janowiak, owner of GardenView Townhomes LLC, in Mesa, Arizona, and _SHANNON WU_____ (Independent Contractor) of Mesa, Arizona.

FOR AND IN CONSIDERATION OF the mutual promises and benefits of the parties, they do hereby agree to the following:

1. The owner agrees to hire the Independent Contractor to perform the following:
   a. Show apartments when vacant.
   b. Watch for general safety of complex.
   c. Daily pool duties as discussed (clean, etc.). Unlock 9am-close 9pm.
   d. General property cleanup.
   e. Turn gate off before storm.

2. The owner agrees to pay the Independent Contractor the following:
   a. ~~$200.00 credit towards rent.~~ *HALF MONTH RENT PLUS $100*

3. The owner acknowledges that the Independent Contractor is free to set his own work schedule related to work performed.

4. Because the Independent Contractor is engaged in his own business, the Independent Contractor is not eligible for, and shall not participate in, any employer pension, health, or other fringe benefit plans for the client.

5. The Independent Contractor agrees to complete the work to be performed in a manner generally acceptable to the industry in which he/she is being employed. If they parties have agreed to any specification with regard to the job, they have attached said specification as an addendum to this Agreement.

6. The Independent Contractor agrees to indemnify and hold the owner harmless from any claim or liability arising from the work provided by the Independent Contractor.

7. Any changes or addition to this contract shall be in writing and signed by all parties.

8. This contract shall be governed by the laws of the state of Arizona.

FRANCISZEK   JANOWIAK
Name of Owner

Signature of Owner

SHANNON WU
Name of Independent Contractor

Signature of Independent Contractor



EXHIBIT 3
Truong
8.19.2020
Doreen Sutton CR 50076

## Independent Contractor Agreement

THIS AGREEMENT, entered into this the 1ST day of ___MAY___, 2015, by and between Franciszek Janowiak, owner of GardenView Townhomes LLC, in Mesa, Arizona, and ___SHANNON WU___ (Independent Contractor) of Mesa, Arizona.

FOR AND IN CONSIDERATION OF the mutual promises and benefits of the parties, they do hereby agree to the following:

1. The owner agrees to hire the Independent Contractor to perform the following:
    a. Show apartments when vacant.
    b. Watch for general safety of complex.
    c. Daily pool duties as discussed (clean, etc.). Unlock 9am-close 9pm.
    d. General property cleanup.
    e. Turn gate off before storm.

2. The owner agrees to pay the Independent Contractor the following:
    a. ~~$200.00 credit towards rent~~ *HALF MONTH RENT PLUS $100*
    b. ~~FREE RENT~~ *FROM AUGUST 2015*

3. The owner acknowledges that the Independent Contractor is free to set his own work schedule related to work performed.

4. Because the Independent Contractor is engaged in his own business, the Independent Contractor is not eligible for and shall not participate in, any employer pension, health, or other fringe benefit plans for the client.

5. The Independent Contractor agrees to complete the work to be performed in a manner generally acceptable to the industry in which he/she is being employed. If they parties have agreed to any specification with regard to the job, they have attached said specification as an addendum to this Agreement.

6. The Independent Contractor agrees to indemnify and hold the owner harmless from any claim or liability arising from the work provided by the Independent Contractor.

7. Any changes or addition to this contract shall be in writing and signed by all parties.

8. This contract shall be governed by the laws of the state of Arizona.

FRANCISZEK JANOWIAK
Name of Owner

[signature]
Signature of Owner

SHANNON WU
Name of Independent Contractor

[signature]
Signature of Independent Contractor

THIS AGREEMENT, entered into this 1 day of August, 2018 by and between Franciszek Janowiak, owner of Gardenview Townhomes LLC, in Mesa, Arizona and ___Shannon G. Truong___ (Independent Contractor) of Mesa, Arizona.

FOR AND IN CONSIDERATION OF the mutual promises and benefits of the parties, they do hereby agree to the following:

1.  The owner agrees to hire the Independent Contractor to perform the following:
    a.  Show vacant apartments when available
    b.  Watch for general safety of complex
    c.  Daily Pool duties as discussed (clean, etc), open 10am – 9pm close (varies)
    d.  General Property clean up
    e.  Turn gate off before storm
    f.  Collect Rent, process past dues, non-compliant notices, evictions
2.  The owner agrees to pay the Independent Contractor the following:
    a.  $619.08 credit towards rent
    b.  Free rent from September 2017 to July 2018



EXHIBIT   4
Truong
8.19.2020
Doreen Sutton CR 50076

3.  The owner acknowledges that the Independent Contractor is free to set his own work schedule related to work performed.
4.  Because the Independent Contractor is engaged in his own business, the Independent Contractor is not eligible for, and shall not participate in, any employer pension, health, or other fringe benefit plans for the client.
5.  The Independent Contractor agrees to complete the work to be performed in a manner generally acceptable to the industry in which he/she is being employed. If the parties have agreed to any specification with regards to the job, they have attached said specification as an addendum to this Agreement.
6.  The Independent Contractor agrees to indemnify and hold the owner harmless from any claim or liability arising from the work provided by the Independent Contractor.
7.  Any changes to this contract shall be in writing and signed by all parties.
8.  This contract shall be governed by the laws of state of Arizona.

_FRANCISZEK JANOWIAK_

Name of Owner

_Shannon G. Truong_

Name of Contractor

Signature of Owner

Signature of Contractor

TRUONG002688

THIS AGREEMENT, entered into this 1 day of January, 2018 to 31st of December, 2018 by and between Franciszek Janowiak, owner of Gardenview Townhomes LLC, in Mesa, Arizona and _____Shannon Truong_____ (Independent Contractor) of Mesa, Arizona.

FOR AND IN CONSIDERATION OF the mutual promises and benefits of the parties, they do hereby agree to the following:

1. The owner agrees to hire the Independent Contractor to perform the following:
   a. Show vacant apartments when available
   b. Watch for general safety of complex
   c. Daily Pool duties as discussed (clean, etc), open 10am – 9pm close (varies)
   d. General Property clean up
   e. Turn gate off before storm
   f. Collect Rent, process past dues, non-compliant notices, evictions

2. The owner agrees to pay the Independent Contractor the following:
   a. Free Rent from January 1, 2018 to December 31, 2018



3. The owner acknowledges that the Independent Contractor is free to set his own work schedule related to work performed.

4. Because the Independent Contractor is engaged in his own business, the Independent Contractor is not eligible for, and shall not participate in, any employer pension, health, or other fringe benefit plans for the client.

5. The Independent Contractor agrees to complete the work to be performed in a manner generally acceptable to the industry in which he/she is being employed. If the parties have agreed to any specification with regards to the job, they have attached said specification as an addendum to this Agreement.

6. The Independent Contractor agrees to indemnify and hold the owner harmless from any claim or liability arising from the work provided by the Independent Contractor.

7. Any changes to this contract shall be in writing and signed by all parties.

8. This contract shall be governed by the laws of state of Arizona.


Franciszek Janowiak

Name of Owner

Signature of Owner


Shannon Truong

Name of Contractor

Shannon Truong

Signature of Contractor

TRUONG002686



301 E. Bethany Home Rd., #B-140
Phoenix, Arizona 85012
(602) 957-4999 • Fax (602) 957-5239
camproperties.com

# EMPLOYMENT AGREEMENT

This employment agreement, hereinafter called agreement, is by and between Consolidated Asset Management, Inc. (C.A.M.) 301 E. Bethany Home Rd., #B-140, Phoenix, Arizona 85012 and _Shannon Y Truong_____, hereinafter called employee, who agree as follows:

1.  **Employer** hereby employs employee and employee accepts employment at employer's facilities located at _____, in the city of _____, State of _____.

2.  Employee shall perform such duties at employer's facilities above described as employer shall direct.

3.  As compensation for services employee shall receive $_____12_____ per hour, less mandated taxes. Employer and employee agree that ____10____ hours is a reasonable estimate of the number of hours that employee shall work each week and that such estimate will allow employee ample time to perform all of his or her duties.

    If employment includes an Employer-supplied apartment, upon employment Employee will submit a list of occupants of the unit to Employer for approval. Any changes in occupants in Employer-supplied unit must first be approved by Employer. The permitting of unauthorized persons to dwell in Employer-supplied unit is grounds for immediate termination.

4.  Employee agrees to keep time records each week and to notify employer of any week when actual hours worked is different from the estimated hours hereinabove set out. Should employer not receive a completed timesheet, employer shall not pay employee until timesheet is received or the following pay period. Stating hours on a timesheet in excess of those actually worked is cause for immediate termination. Employee timesheet will be periodically audited for verification of hours worked.

5.  Employee agrees that any overtime worked shall be pre-approved in writing by employee's supervisor.

6.  Employee agrees to notify the supervisor of an illness before the beginning of the business day of the absence. For any personal time off, notification must be given to the supervisor at least 48 hours in advance. Vacation requests must be submitted and approved two weeks prior to the first day of the time requested.

7.  This agreement shall be for the term of one year from the date hereof unless either party gives notice of termination as hereinafter set out. Should no notice of termination be given, this agreement shall be renewed automatically on a month to month basis.

8.  Employee agrees that the cost of unauthorized purchases of tools, parts or any other items from suppliers on employer's account will be deducted from the employee's paycheck and the money will be used to reimburse employer for the cost of such purchases. Employee agrees to reimburse employer for the cost of employer-supplied items that are lost by employee. Examples of such items include, but are not limited to, **pagers, cell phones and tools.**

EXHIBIT ___6___
Truong
8.19.2020
Doreen Sutton CR 50076

TRUONG002890

9. Any unauthorized removal of company property from company premises is cause for immediate termination and may result in criminal prosecution. Unauthorized removal of company records including tenant ledger cards, deposit slips, tenant records from the premises will be prosecuted as a criminal act to the fullest extent of the law.

10. Employer may terminate this agreement upon no notice for any reason whatsoever. Such notice may be given by regular or certified mail or delivered in person. Upon termination of employment employee agrees to return to employer all customer lists, petty cash, deposits, books, records, keys and all company property of any kind which is in employee's possession at the time of termination. In addition, employee agrees to vacate and surrender possession of employer-provided apartment and remove all of employee's personal effects there within 3 days from the date of notice of termination of employment as herein provided, and employee shall deliver the key to such apartment to employer forthwith.

If Employee lives in employer-provided apartment, Employer will withhold the final paycheck of Employee until such time as the Employee's personal belongings are removed from the premises and a move out inspection has been conducted. Employer will also withhold Employee's final paycheck until costs of unauthorized purchases, phone usage, loans, cleaning and damage to the apartment and any other unauthorized costs incurred by employee are paid back to Employer by Employee. Employer is entitled to deduct from final paycheck of Employee these costs as well as any legal fees incurred in actions against Employee.

Employee's Initials: _____ *SGT*

After termination Employee shall not return to the property for any reason. If Employee returns to property it will be considered trespassing and treated accordingly.

11. I will follow all company policies and realize that deviation from these policies could result in termination or other disciplinary action.

12. I understand that my paycheck will be deposited in the U.S. Mail on payday. Paydays are on the 15th and the last day of each month. If either of these days fall on a weekend, the preceding Friday will be payday.

13. I also understand as an employee of C.A.M., that it is my responsibility to turn in my timesheets on the required date (usually 5 business days prior to paydate) to the designated person to ensure payment on the days shown above and I have read and agree with the above.

14. Other conditions of employment can be found in the Consolidated Asset Management, Inc., Employee Handbook.

Signed this ___*24*___ day of ___*October*___ 20__*18*

_____     *Shannon*
Employer                                     Employee

**CONSOLIDATED ASSET MANAGEMENT, INC.**

EXHIBIT 7
Truong
8.19.2020
Doreen Sutton CR 50076

## TIME SHEET

Employee Name _Shannon Gana_

Project _Gardenview Townhomes_          Period Ending _____

| DATE | Property Number | Invoice Number | AM IN | AM OUT | PM IN | PM OUT | TOTAL REG | HOURS O/T |
|------|-----------------|----------------|-------|--------|-------|--------|-----------|-----------|
| 11/8 | | | 8AM | 10AM | | | 2 | |
| 11/9 | | | 8AM | 10AM | | | 2 | |
| 11/12 | | | 8AM | 10AM | | | 2 | |
| 11/13 | | | 8AM | 10AM | | | 2 | |
| 11/14 | | | 8AM | 10AM | | | 2 | |
| 11/15 | | | 8AM | 10AM | | | 2 | |
| 11/16 | | | 8AM | 10AM | | | 2 | |
| 11/19 | | | 8AM | 10AM | | | 2 | |
| 11/20 | | | 8AM | 10AM | | | 2 | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | TOTAL | 18 | |

I, the undersigned, certify that this is a true and accurate record of my working hours for the stated time period. I also understand that all overtime must be pre-approved in writing by my supervisor.

Employee Signature _Shannon Gana_          Date _11/27/18_

Supervisor Signature _____          Date _____

TRUONG002903

**CONSOLIDATED ASSET MANAGEMENT, INC.**

EXHIBIT 8
Truong
8.19.2020
Doreen Sutton CR 50076

## TIME SHEET

Employee Name _Shannon Dana_

Project _Gardenview Townhomes_          Period Ending _____

| DATE | Property Number | Invoice Number | AM IN | AM OUT | PM IN | PM OUT | TOTAL REG | HOURS O/T |
|------|-----------------|----------------|-------|--------|-------|--------|-----------|-----------|
| 12/10 | | | 8am | 10am | | | 2 | |
| 12/11 | | | 8am | 10am | | | 2 | |
| 12/13 | | | 8am | 10am | | | 2 | |
| 12/14 | | | 8am | 10am | | | 2 | |
| 12/17 | | | 8am | 10am | | | 2 | |
| 12/18 | | | 8am | 10am | | | 2 | |
| 12/19 | | | 8am | 10am | | | 2 | |
| 12/20 | | | 8am | 10am | | | 2 | |
| 12/21 | | | 8am | 10am | | | 2 | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | TOTAL | 18 | |

I, the undersigned, certify that this is a true and accurate record of my working hours for the stated time period. I also understand that all overtime must be pre-approved in writing by my supervisor.

Employee Signature _Shannon Dana_          Date _12/21/18_

Supervisor Signature _____          Date _____

**CONSOLIDATED ASSET MANAGEMENT, INC.**

EXHIBIT 9
Truong
8.19.2020
Doreen Sutton CR 50076

## TIME SHEET

Employee Name _Shannon Ouira_

Project _Gardenview Townhomes_     Period Ending _____

| DATE | Property Number | Invoice Number | AM IN | AM OUT | PM IN | PM OUT | TOTAL REG | HOURS O/T |
|------|-----------------|----------------|-------|--------|-------|--------|-----------|-----------|
| 12/10 | | | 8am | 10am | | | 2 | |
| 12/11 | | | 8am | 10am | | | 2 | |
| 12/13 | | | 8am | 10am | | | 2 | |
| 12/14 | | | 8am | 10am | | | 2 | |
| 12/17 | | | 8am | 10am | | | 2 | |
| 12/18 | | | 8am | 10am | | | 2 | |
| 12/19 | | | 8am | 10am | | | 2 | |
| 12/20 | | | 8am | 10am | | | 2 | |
| 12/21 | | | 8am | 10am | | | 2 | |
| 12/24 | | | 8am | 10am | | | 2 | |
| 12/26 | | | 8am | 10am | | | 2 | |
| 12/27 | | | 8am. | 10am | | | 2 | |
| 12/28 | | | 8am | 10am | | | 2 | |
| 12/31 | | | 8am | 10am | | | 2 | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | TOTAL | 28 | |

I, the undersigned, certify that this is a true and accurate record of my working hours for the stated time period. I also understand that all overtime must be pre-approved in writing by my supervisor.

Employee Signature _Shannon Ouira_     Date _12/31/18_

Supervisor Signature _____     Date _____

TRUONG002905

EXHIBIT 3

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | DISTRICT OF ARIZONA |

| | | | |
|---|---|---|---|
| 3 | | | |
| 4 | Shannon Truong, an Arizona resident, | ) | Case No. |
| | | ) | 2:19-CV-05398-DLR |
| 5 | | ) | |
| | Plaintiff, | ) | |
| 6 | | ) | |
| | v. | ) | |
| 7 | | ) | |
| | Garden View Townhomes, LLC, an | ) | |
| 8 | Arizona company; Franciszek | ) | |
| | Janowiak, an Arizona resident; | ) | |
| 9 | and Elzbieta Janowiak, an | ) | |
| | Arizona resident; | ) | |
| 10 | | ) | |
| | Defendants. | ) | |
| 11 | | ) | |

12

13

14                    DEPOSITION OF JESSICA GREEN
                      via ZOOM VIDEOCONFERENCE
15
                           May 11, 2020
16                      Scottsdale, Arizona
                           2:26 p.m.
17

18

19

20   Reported by:

21   DOREEN SUTTON, RPR, CSR, CR, FAPR
     Certified Reporter
22   Certificate No. 50076

23   Prepared for:

24

25   (COPY)

JESSICA GREEN – 5.11.2020

1                              I N D E X

2    WITNESS                                        PAGE

3    JESSICA GREEN

4     Examination by Mr. Hundley                       4

5     Examination by Ms. Rader                        40

6     Re-examination by Mr. Hundley                   42

7

8

9

10                           E X H I B I T S

11   NUMBER           DESCRIPTION                  PAGE

12   Exhibit 1        Property Management Agreement   11

13   Exhibit 2        Garden View Townhomes
                      Financial Reports for the
14                    Month of October 2018           24

15   Exhibit 3        Garden View Townhomes
                      Financial Reports for the
16                    Month of November 2018          28

17   Exhibit 4        Garden View Townhomes
                      Financial Reports for the
18                    Month of December 2018          30

19   Exhibit 5        Independent Contractor
                      Agreement dated 5/1/2015        34
20
     Exhibit 6        Independent Contractor
21                    Agreement dated 1/1/2018        34

22   Exhibit 7        Independent Contractor
                      Agreement dated 8/1/2018        34

23

24

25

JESSICA GREEN — 5.11.2020

1                        <u>DEPOSITION OF JESSICA GREEN</u>

2

3             The deposition of JESSICA GREEN was taken

4  before DOREEN SUTTON, Certified Reporter No. 50076, for

5  the State of Arizona, on May 11, 2020, via Zoom

6  videoconference, commencing at the hour of 2:26 p.m.

7

8  APPEARANCES:

9  FOR THE PLAINTIFF:

10  Mr. Jason Barrat
    ZOLDAN LAW GROUP, PLLC
11  14500 North Northsight Boulevard, Suite 133
    Scottsdale, Arizona 85260
12  jbarrat@zoldangroup.com

13
    FOR THE DEFENDANTS GARDEN VIEW TOWNHOMES/FRANCISZEK
14  JANOWIAK:

15  Mr. Richard W. Hundley
    THE KOZUB LAW GROUP, PLC
16  7537 East McDonald Drive
    Scottsdale, Arizona 85250
17  rhundley@kozublaw.com

18
    FOR THE DEFENDANT ELZBIETA JANOWIAK:
19
    Ms. Deanna R. Rader
20  RADER MAYROSE LLP
    812 North Second Avenue
21  Phoenix, Arizona 85003
    drader@radermayrose.com
22

23

24

25

JESSICA GREEN - 5.11.2020

1           (Deposition Exhibits Nos. 1 through 7 were

2    marked for identification.)

3

4                       JESSICA GREEN,

5    called as a witness herein, having been first duly sworn

6    by the certified reporter, was examined and testified as

7    follows:

8

9                       EXAMINATION

10   BY MR. HUNDLEY:

11       Q.    First let me introduce myself.  I'm Richard

12   Hundley and I represent two defendants in a United States

13   District Court for the District of Arizona case, which

14   has been brought by Shannon Truong.  Shannon's attorney

15   is Jason Barrat, who's also participating today.  I

16   represent the Garden View Townhomes, LLC, and Frank

17   Janowiak.  Deanna Rader is also participating and she

18   represents Frank's ex-wife, Elzbieta Janowiak.

19           First of all, Jessica, would you please state

20   your name.

21       A.    Jessica Green.

22       Q.    And where are you right now?

23       A.    I'm in my office at Third Street and Bethany

24   Home Road.

25       Q.    Have you ever had your deposition taken before?

JESSICA GREEN - 5.11.2020

1   just going to have to speak loud and clear and talk over

2   me or maybe have that dog bark, maybe that'll do it.

3   Does that sound fair, Jason and Deanna?

4        MR. BARRAT:  Yes, that's fair.

5        MS. RADER:  Yes.

6   Q.    BY MR. HUNDLEY:  Jessica, are you currently

7   employed?

8   A.    Yes.

9   Q.    By whom are you employed?

10  A.    CAM Properties, also --

11  Q.    Is that also -- I'm sorry, I spoke over you.  Is

12  that also known as Consolidated Asset Management, Inc.?

13  A.    Yes.

14  Q.    What kind of work or services does CAM

15  Properties provide?

16  A.    We're a third-party property management company

17  in the multi-family industry.

18  Q.    When you say "third-party property management,"

19  what do you mean by that?

20  A.    We don't own the buildings we manage, we're

21  hired by ownership groups to run the day-to-day

22  operations and produce financial reports.

23  Q.    And I believe you said in multiunit properties?

24  A.    Correct, multi-family.

25  Q.    Multi-family.  So what does that include?

JESSICA GREEN - 5.11.2020

1     A.    Apartment units anywhere from duplexes up to 400

2  units.

3     Q.    Okay.  So you wouldn't take a single-family

4  residence, but pretty much anything above that?

5     A.    Typically.  We have less than 20 single-family

6  residences we manage, it's not the focus of our business,

7  but we have a few.

8     Q.    Is your management of all residential

9  properties?

10    A.    There's one commercial property in Prescott that

11 we do the books on, everything else is multi-family,

12 one --

13    Q.    I'm sorry, I stepped over you again.  Go ahead.

14    A.    And we also manage one homeowners association.

15    Q.    Thank you.  When were you first hired by CAM

16 Properties?

17    A.    2003.

18    Q.    And what is your position now?

19    A.    I'm one of the principals and co-owners.

20    Q.    I think on your website you had an office too;

21 was it chief executive office?

22    A.    Yes, COO.

23    Q.    Okay.  Is the position you have now the same

24 position you had back in the fall of 2018?

25    A.    Yes.

JESSICA GREEN - 5.11.2020

1    Q.    What were your duties as of the fall of 2018?

2    A.    Just to run the day-to-day operations in our

3   office.  So I work with a regional team that oversees the

4   site operations and I work with an accounting team that

5   oversees and does all the accounting for our properties

6   and then communicate with our clients, our owners of the

7   buildings.

8    Q.    Were you also involved in the day-to-day

9   operations of specific customers' properties?

10   A.    Yes -- well, I have staff that I oversee that

11  does the day-to-day operations.

12   Q.    In the course of your work for CAM Properties,

13  did you become involved in the management of the Garden

14  View Townhomes, which is located at 524 South Stapley in

15  Mesa?

16   A.    Yes.

17   Q.    What led CAM Properties to become involved in

18  the management of Garden View?

19   A.    We were contacted by a local broker in town that

20  referred us these clients that said they were -- needed a

21  third-party management while the clients were going

22  through a divorce.  I believe he said the Court required

23  it.

24   Q.    And CAM Properties took over the management of

25  the Garden View Townhomes?

JESSICA GREEN — 5.11.2020

1      A.     Yes.

2      Q.     What was your role in the management of the

3  complex?

4      A.     Our company's role was to run the day-to-day

5  operations of the building, so collect the rent, process

6  delinquents, take care of the daily maintenance required

7  at the site, and then produce reasonable financial

8  reports and accounting of all activity for the owners.

9      Q.     That was CAM Properties' role.  What was your

10  specific role?

11      A.     Specifically, I talked to the owners of the

12  building and I also oversaw the staff that was working

13  with the site employees and our accounting team.

14      Q.     Who else associated with CAM Properties was

15  involved in the management of the Garden View Townhomes?

16      A.     We have a site manager that helps Shannon run

17  the building, she was involved; Rosa.  And then we had an

18  accounting team in our corporate office as well as a

19  regional manager in our corporate office.

20      Q.     What was Rosa's last name?

21      A.     Quintana, I believe.

22      Q.     Can you take a stab at spelling that?

23      A.     That's a great guess -- hold on.  You know what,

24  I think I have it right here.  Let's see if it's on my

25  list here.  Q-U-I-N -- I'm sorry, Q-U-I-N-T-A-N-A.

JESSICA GREEN - 5.11.2020

1    Q.    Quintana?

2    A.    Quintana.

3    Q.    Does she still work with CAM Properties?

4    A.    Yes.

5    Q.    Back when CAM Properties received or undertook

6    this management, who did you understand the owners of

7    Garden View Townhomes were?

8    A.    Frank and his wife, and I don't recall his

9    wife's name off the top of my head.

10   Q.    Did she go by Elizabeth?

11   A.    I believe so.

12   Q.    Or Elzbieta?

13   A.    Yes.

14   Q.    Did you have interactions with both of them?

15   A.    Mostly her, and my interactions with Frank were

16   through Shannon, for the most part.  I did meet Frank and

17   Elizabeth here in our corporate office when we took on

18   management and then I spoke to Elizabeth on the phone a

19   few times, and a lot of my communication with Frank was

20   through Shannon.

21   Q.    Do you recall how many units are in the Garden

22   View Townhomes?

23   A.    Twenty-eight.

24   Q.    Were they all occupied when CAM Properties took

25   over the management?

JESSICA GREEN - 5.11.2020

1      A.   I -- I don't recall if they were all occupied.

2  I could look back at our records.  I know the building

3  stayed pretty well occupied during our management, there

4  wasn't significant turnover or vacancy issues.

5      Q.   The exhibits I gave you, Exhibit 1 was a

6  property management agreement.  Do you have that?

7      A.   Uh-huh.  Yes, I'm pulling that up right now.

8  Okay, I have the exhibits in front of me.

9      Q.   Take a look at Exhibit 1, the property

10 management agreement.  First of all, let me know if

11 you've ever seen this before?

12     A.   Yes.

13     Q.   And was this the document through which CAM

14 Properties was hired to manage the complex?

15     A.   Yes.

16     Q.   We didn't have a signed copy of it.  If you turn

17 to page five, there's a signature line.

18     A.   Uh-huh.

19     Q.   Would you have been the one to have signed it on

20 behalf of Consolidated Asset Management?

21     A.   Either me or my partner Mike, I can look to see

22 who signed it.

23     Q.   What's Mike's last name?

24     A.   Osselaer, O-S-S-E-L-A-E-R.

25     Q.   When did CAM Properties begin to manage the

JESSICA GREEN - 5.11.2020

1  Garden View Townhomes?

2      A.   It was towards the end of September, beginning

3  of October of 2018.  Let me -- I don't know exactly off

4  the top of my head the day we took over.  I could

5  reference our files.

6      Q.   That's fine.  Do you recall when CAM Properties

7  ceased managing the Garden View Townhomes?

8      A.   The end of December 2018.

9      Q.   Just a little over three months?

10     A.   Correct.  Yes.

11     Q.   This Exhibit 1, property management agreement,

12  its paragraph three is entitled Duties of Manager.

13     A.   Uh-huh.

14     Q.   It says parts A through O, I guess, are those an

15  accurate list of all the duties required of CAM

16  Properties?

17     A.   Yes.

18     Q.   And did it perform those duties?

19     A.   Yes.

20     Q.   Did it have any problems at any point in acting

21  as manager?

22     A.   You know, it was difficult working with a couple

23  getting divorced.  They obviously just had different

24  views of the property and it was a difficult position to

25  be in.  So I think those were our biggest challenges was

JESSICA GREEN - 5.11.2020

1  the wife had a view of running it and the husband had a

2  view and it didn't always agree, and we were in a

3  conflicted position.

4      Q.   In that situation under the property management

5  agreement, did CAM Properties then have the power to

6  decide which way to go?

7      A.   We look to our client for direction on which way

8  to run our buildings, including this one, so we look to

9  our client for their input on things they want to

10  accomplish, goals of the building, and we would look to

11  them for direction.

12     Q.   I think you said that your contacts with

13  Mr. Janowiak were through Shannon Truong?

14     A.   Primarily, correct.

15     Q.   Do you recall any direct contact you had with

16  Mr. Janowiak?

17     A.   He came to our office and I met with him here in

18  our office just before we took on management; that was

19  some direct contact.  And I believe he may have had some

20  direct contact regarding he would use our Home Depot

21  account to purchase materials for the building and I

22  believe we had some direct contact regarding that.

23     Q.   But it sounds like it wasn't a lot of contact

24  during the three months or so?

25     A.   Correct, a lot of it was communication which was

JESSICA GREEN - 5.11.2020

1    through Shannon.

2         Q.    Okay.  About how often would you have contact

3    with Elizabeth?

4         A.    She would check in about once a week or every

5    other week and ask how things were going, she'd call at

6    our office here.  That's an estimate of her check-in,

7    maybe in the beginning once a week and then, you know,

8    after a month, maybe, it was every other week as an

9    estimate of my best recollection.

10        Q.    And I take it during that period of your

11   management, you interacted with Shannon Truong as well?

12        A.    Yes.

13        Q.    And did you know her under any other names?

14        A.    No, I -- recently she e-mailed under a different

15   name or the e-mail had a different name under the

16   address, but this is the only name we were familiar with

17   her under.

18        Q.    Do you recall her using the name Shannon Gana?

19        A.    Shannon Gana is the name that we're familiar

20   with her under.

21        Q.    Oh, okay.  You said that she e-mailed you under

22   a different name?

23        A.    She did.  I didn't put it together with who was

24   e-mailing until you contacted for this deposition, and

25   then it was a very vague e-mail.

JESSICA GREEN — 5.11.2020

1   Q.   Do you recall what it said?

2   A.   It just asked if Frank's attorney had contacted

3   me.  And I didn't know who Frank was when I got the

4   e-mail at the time, and I didn't recognize her name.  I

5   didn't recognize her name.  And she signed it by Shannon,

6   but the e-mail had a different -- it almost looked like

7   spam at the time.

8   Q.   Did you respond to that e-mail?

9   A.   I did not.

10  Q.   Did the e-mail say anything else other than what

11  you just mentioned?

12  A.   I don't believe so.  That's all I remember is

13  Frank's attorney contacted me.

14  Q.   When CAM Properties became involved in the

15  management, did you understand that Ms. or that Shannon

16  was a tenant in the Garden View Townhomes?

17  A.   I understood she was a manager, but an onsite

18  manager that lived at the building.

19  Q.   Who told you that she was the onsite manager

20  that lived at the building?

21  A.   Frank and Elizabeth when we both met, I met both

22  of them, they both said that she was the manager at the

23  building.

24  Q.   Did they tell you what her duties were?

25  A.   She would collect the rents from the residents

JESSICA GREEN – 5.11.2020

1  and give it to Frank, she would pick up the grounds, you

2  know, like pick up the grounds three, four days a week of

3  any debris, she would schedule showings of the vacant

4  units to lease them.  She would get an application from a

5  prospective resident and give it to the owners, Frank and

6  Elizabeth.  That was our understanding of her roles when

7  we got involved with the building.

8      Q.    That is what you were told by Frank and

9  Elizabeth?

10     A.    Yes.

11     Q.    Did they indicate to you how she was

12 compensated?

13     A.    At the time they said -- I don't recall the

14 specific conversations.  I know she had free rent, but I

15 don't recall the specific conversations about how she was

16 compensated from them.

17     Q.    But you did know going into the management that

18 she got free rent?

19     A.    That was my understanding.

20     Q.    Did Frank and/or Elizabeth tell you how many

21 days a week Shannon worked?

22     A.    We established a schedule for her working with

23 us.

24     Q.    I'll get to that, I just want to know what Frank

25 and Elizabeth may have said?

JESSICA GREEN - 5.11.2020

1      A.    I don't recall what they would have said before

2  we took over.

3      Q.    Did they say anything about how many hours a

4  week she worked?

5      A.    I don't recall any conversation on that.

6      Q.    Did they say anything about Shannon being on

7  call 12 hours a day or any period of time a day?

8      A.    I don't recall having any conversation on that.

9      Q.    After this conversation with Frank and Elzbieta,

10  did you have a subsequent conversation with Shannon?

11      A.    My site did -- my staff did, I did not.

12      Q.    That was Rosa?

13      A.    Yes, Rosa and a regional from our corporate

14  office.

15      Q.    Who was that?

16      A.    Elidia was involved and I know there was one

17  other one.  I'd have to look back.

18      Q.    Did you ever have a conversation with Shannon?

19      A.    On the phone, yes.

20      Q.    Do you recall what was discussed?

21      A.    You know, it was over a three-month period I

22  talked to her on and off.  It was often questions about

23  collections or if someone had paid or if they hadn't

24  paid, what the resident communicated when they are going

25  to pay, so -- and then also, discussions about any

JESSICA GREEN - 5.11.2020

1   vacants or market readies.  So it was just daily

2   operations discussions was mostly what my conversations

3   with her were about.

4        Q.   Do you recall any discussions with her regarding

5   the scope of her duties?

6        A.   With us, once we took over, we had a

7   conversation, but prior to us taking over what that

8   arrangement was, I don't recall any conversation about.

9        Q.   The conversation you had with her once you took

10  over, do you recall that conversation?

11       A.   Specifically with me, I don't.  I can't recall

12  what that conversation was, but -- no.

13       Q.   Was there ever a discussion with you and Shannon

14  or with any of your co-employees and you as to whether

15  Shannon was an employee or an independent contractor of

16  the Garden View Townhomes?

17       A.   I don't recall.

18       Q.   Were you ever shown any documents concerning

19  Ms. Truong's position as a manager?

20       A.   I -- yes, her employment documents and her

21  independent contractor documents I was shown and her time

22  sheets.

23       Q.   Who provided you those documents?

24       A.   My staff.

25       Q.   Okay.  What were Shannon's duties once CAM

JESSICA GREEN - 5.11.2020

1   Properties took over?

2       A.   She would collect rent from the residents, she

3   would give it to Rosa; so it wasn't posting it in our

4   system or depositing it, we did those functions for her.

5   She would show any vacant units and give us applications

6   to run for credit check, background check.  She would

7   pick up the grounds and take phone calls for prospective

8   residents about moving in, she would take phone calls

9   from current residents if they had a work order, and she

10  would schedule a work order with a vendor or one of our

11  maintenance techs.

12      Q.   Do you recall there being vacant units during

13  the three months or so that CAM Properties was manager?

14      A.   I don't recall.  I would assume there was one or

15  two, but I don't recall.

16      Q.   If there were, is it fair to assume there were

17  not many?

18      A.   Correct.

19           I was answering yes, there were not many to his

20  question.

21      Q.   Did Frank and Elizabeth encourage you to keep

22  Shannon as the onsite manager?

23      A.   To my recollection, yes, Frank encouraged us to

24  keep her on.  And Elizabeth was a little bit hesitant,

25  was my recollection.

JESSICA GREEN - 5.11.2020

1    Q.    Did Elizabeth indicate why she was hesitant?

2    A.    She thought Shannon worked more for Frank and

3    did what Frank wanted versus what she wanted, was my

4    understanding.

5    Q.    Would it be typical for CAM Properties when they

6    step into a management to keep on an onsite manager?

7    A.    Oftentimes we keep on an onsite manager.

8    Q.    Now, Rosa Quintana, how often was she at the

9    property?

10    A.    At the beginning she was there frequently,

11    making sure we got our rent roll and our system set up,

12    and then during rent collection.  The first weeks of the

13    month she would go by daily and pick up rent and after

14    that, my recollection, she'd go a couple times a week,

15    maybe towards the end of the month, maybe once a week.

16    Q.    Was Rosa involved at all in any of the

17    maintenance work at the apartment?

18    A.    She may have given Shannon -- and I don't have

19    direct knowledge -- she may have given Shannon some

20    guidance on scheduling a maintenance tech or calling out

21    a vendor if someone's A/C was down.

22    Q.    But nobody at CAM Properties had the

23    responsibility for doing any maintenance work; is that

24    fair?

25    A.    Yes.  To the best of my knowledge, I believe it

JESSICA GREEN — 5.11.2020

1   was we would call vendors out and use vendors for it.

2       Q.    Who would select the vendors?

3       A.    We would, with Frank's input.  So sometimes

4   Frank would say he wants specifically to use this vendor.

5       Q.    When Rosa was out at the property, did she have

6   an office to use?

7       A.    I don't recall.  It was the same space that

8   Shannon used.

9       Q.    Was Shannon paid for her duties while CAM

10  Properties was the manager?

11      A.    Yes.

12      Q.    Was she paid hourly?

13      A.    Hourly.

14      Q.    And how much was she paid hourly?

15      A.    I believe 12 an hour.

16      Q.    Who selected that amount?

17      A.    I don't recall.

18      Q.    Who normally would select that amount?

19      A.    It's a conversation between us and our client,

20  what our manager's salary is or any maintenance tech, so

21  I would assume it was a conversation between us and Frank

22  and Elizabeth.

23      Q.    Do you recall how many hours a week Shannon

24  worked while CAM Properties acted as the manager?

25      A.    I believe it was ten hours a week.

JESSICA GREEN — 5.11.2020

1    Q.    And how was that ten-hour period determined?

2    A.    By the size of the building.  So typically, 28

3    units, that's what we expect the amount of work it takes

4    for a manager with her duties.

5    Q.    So this is based on your experience through CAM

6    Properties?

7    A.    Yes.

8    Q.    That ten hours, do you have a breakdown as to

9    how much of that was necessary for rent collection or

10   showing apartments or pickup duties?

11   A.    No, not a breakdown.

12   Q.    You assumed that Shannon would be doing

13   something every day, seven days a week?

14   A.    Five days a week.

15   Q.    Five days a week?

16   A.    Yeah.

17   Q.    But that duty should take no more than two hours

18   a day?

19   A.    Yes.

20   Q.    I guess on the rental issue, that's just going

21   to be -- the rent collection issue, excuse me, that was

22   primarily just the last few days or the first week of the

23   month?

24   A.    Correct.

25   Q.    While your company was involved in the

1   administrative work from October 1st to October 23rd.

2        Q.    So a little over three weeks?

3        A.    Approximately.

4        Q.    And is the check for $408?

5        A.    Correct.

6        Q.    Is that a net amount -- strike that.

7              Did you take anything out for taxes?

8        A.    No.

9        Q.    Is that because you treated her as an

10  independent contractor?

11       A.    Yes, I believe so.

12       Q.    And did you feel that her services fell within

13  the definition of an independent contractor?

14       A.    We did.

15       Q.    And why was that?

16       A.    I'd have -- I don't specifically know why she

17  was set up as an independent contractor.  I'd have to

18  look into her file.

19       Q.    Did you understand that Shannon could pick her

20  own hours to do whatever work was required?

21       A.    No.

22       Q.    Were hours assigned to her?

23       A.    I believe we had a -- to the best of my

24  recollection, we had a conversation with her and

25  established what hours would work for her and for the

JESSICA GREEN - 5.11.2020

1  STATE OF ARIZONA          )
                            )  ss.
2  COUNTY OF MARICOPA        )

3      BE IT KNOWN that the foregoing proceedings were
   taken before me; that the witness before testifying was
4  duly sworn by me to testify to the whole truth; that the
   foregoing pages are a full, true, and accurate record of
5  the proceedings, all done to the best of my skill and
   ability; that the proceedings were taken down by me in
6  shorthand and thereafter reduced to print under my
   direction.

7

       I CERTIFY that I am in no way related to, nor
8  employed by any of the parties hereto, and have no
   interest in the outcome thereof.

9

       [X] Review and signature was requested.
10         Review and signature was waived.
           Review and signature not requested.

11

       I CERTIFY that I have complied with the ethical
12 obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
   J(1)(g)(1) and (2).  Dated at Scottsdale, Arizona, this
13 18th day of May, 2020.

14

15

16  _____
               DOREEN SUTTON, FAPR, CSR
               Certified Reporter #50076
17         Registered Professional Reporter

18         *        *        *        *        *        *

19

20     I CERTIFY that DS REPORTING, LLC, has complied with
   the ethical obligations set forth in ACJA
21 7-206(J)(1)(g)(1) through (6).

22

23

24  _____
               DS REPORTING, LLC
           Registered Reporting Firm
25          Arizona RRF No. R1042

*Janowiak v. Janowiak*



# PROPERTY MANAGEMENT AGREEMENT

This AGREEMENT is entered into this __25th__ day of __Sept__, __2018__ (or Close of Escrow) by and between CONSOLIDATED ASSET MANAGEMENT, INC. (MANAGER) and Garden View Townhomes, LLC

1. APPOINTMENT OF MANAGER AS INDEPENDENT CONTRACTOR. Owner hereby appoints Manager as the exclusive

leasing and managing agent of the property and improvements thereon located and named as follows:

PROPERTY

Garden View Townhomes

ADDRESS

524 S. Stapley Dr. Mesa, AZ 85204



2. Manager hereby accepts the appointment and agrees to perform in accordance with the provisions of this Agreement. Everything undertaken or done by Manager under this Agreement shall be done as an independent contractor of Owner.

3. DUTIES OF MANAGER. Manager shall, on behalf of and at the expense of Owner (except as otherwise provided in paragraphs 2 (i) and 8 (b)), perform all services required in connection with the efficient operation of the Property, subject at all times to Owner's general supervision and control. It shall be the duty and responsibility of Manager:

   (a) To advertise available space for lease in the Property through the use of signs, circulars and other forms of advertising acceptable to Owner.

   (b) To use its best efforts to rent or lease space now or hereafter becoming vacant to tenants acceptable to Owner on terms and conditions previously approved by Owner.

   (c) To collect, on or before the due date therefore, all rents, rent tax and other amounts payable, and otherwise enforce all leases with respect to the Property, and to perform the obligations of the Owner thereunder.

   (d) When necessary, and with the prior approval of Owner, to institute legal actions or proceedings for the collection of delinquent rents and other income from the Property, for the dispossession of tenants or other persons therefrom and for the enforcement of other provisions of the leases.

   (e) To contract in Owner's name for electricity, gas, water, telephone, refuse removal, lawn maintenance, pest control and such other services as shall be necessary and advisable for the proper operation of the Property, provided, however, that Manager shall not, without Owner's prior written consent, contract for any services for the estimated cost of which would exceed the sum of $500.00 per month with the exception of gas, water or electricity.

   (f) To make or cause to be made all necessary repairs, alterations, additions and improvements to the Property and to supervise the same so that all repairs, alterations, additions and improvements are diligently completed in a good and workmanlike manner, to purchase all necessary supplies and materials, and to do all other things necessary to maintain the Property in a clean, safe and orderly condition and to ensure compliance with all federal, state and local statutes, ordinances, rules and regulations applicable to the Property. Manager shall obtain and keep current all licenses and permits required in connection with the ownership and operation of the Property. Except in the event of an emergency requiring immediate repairs and Owner is not readily available for consultation, the total expense to be incurred for any single repair, alteration, addition, improvement or purchase shall not exceed the sum of $1,000.00 (i) without the prior authorization of Owner and (ii) the prior approval or designation by Owner of the contractors and/or subcontractors to be used. In the event of such an emergency, Manager shall promptly notify Owner of all repairs completed, purchases made and the contractor and/or subcontractor used with respect thereto, and Owner shall have the right to approve or designate the contractor and/or subcontractor to be used to complete any unfinished work. Manager shall use its best efforts to make all repairs, alterations, additions and improvements and to obtain all materials, supplies, and services at the best economic price, and shall remit to Owner any rebate, commission or discount allowed in connection therewith. Any such

– 2 –

repairs, alterations, additions or improvements shall be the Property of Owner and shall remain upon the Property upon any termination of this Agreement.

(g) To hire, train, discharge and supervise all persons which Manager reasonably determines are necessary to carry out Manager's duties hereunder, provided that Manager shall not discriminate against any employee or applicant on the basis of race, creed, color, sex or national origin. Manager agrees to use reasonable care in the selection of such employees and it is expressly understood and agreed that all employees shall be employees of Manager and not employees of Owner.

(h) To establish and maintain complete and orderly files containing correspondence, maintenance and service contracts, rent and security deposit records, payroll records, leases, receipts, unpaid bills, vouchers and all other documents and papers pertaining to the Property and the management and operation thereof all of which shall be and shall remain the property of Owner and shall be available to Owner and its representatives for inspection at any time during regular business hours.

(i) To establish and maintain consistently applied, accurate and complete records of account with proper entries for all income and disbursements pertaining to the Property. The cost of the accounting software subscription used for this purpose will be at Owner's expense and will be paid monthly. These records of account shall be and remain the property of Owner and shall be available to owner and its representatives for inspection at any time during regular business hours.

(j) To review carefully all bills and statements received for services, work, supplies and other expenditures incurred by or on behalf of Owner in connection with the maintenance, operation and ownership of the Property to ensure that the same are in order and to pay those which are in order in a timely fashion (and in any event, within the time required to obtain discounts).

(k) To supervise each tenant moving into and out of the Property and arrange the dates thereof so that there shall be a minimum of disturbance to the operation of the Property and to other tenants.

(l) To cause to be prepared and filed the necessary forms for employment insurance, withholding and social security taxes and all other taxes and such other forms relating to Manager's employees at the Property.

(m) To cooperate with Owner's accountants in regard to the preparation and filing on behalf of Owner of federal, state, city and any other income and any other tax returns required by any governmental authority in connection with the Property.

(n) To pay all rent tax collected to the appropriate governmental authority.

(o) To perform any other services reasonably necessary for the care, protection, maintenance and efficient operation of the Property and the prevention of waste, damage or injury thereto.

3. ADVANCES BY MANAGER. Payments to be made by Manager at Owner's expense shall be made out of funds held by Manager from time to time for the account of Owner or otherwise provided by Owner. Manager shall not be obligated to make any advance to or for the account of Owner or to pay any amount except out of funds held for or provided by Owner. If Manager voluntarily advances funds for Owner's account for payment of any expense permitted hereunder which does not require Owner's prior approval and is not the responsibility of Manager as provided in paragraphs 2 (i) and 8 (b), Owner shall reimburse Manager therefore within five (5) days after Manager requests the same.

4. BANK ACCOUNTS. All monies received by Manager for or on behalf of Owner shall be deposited immediately in agent's Trust Account. Manager shall remit to Owner upon request all funds (other than security deposits and other refundable deposits) held by Manager for Owner's account and not applied to the payment of Owner's expenses as herein provided, after (i) deduction of the monthly management fee due to Manager pursuant to paragraph 8 and (ii) retention in said Trust Account of the sum of $2,500.00 as reserves for working capital and other contingencies, and any additional amount as Owner may authorize for such purposes. If interest is earned on the account it will be to the benefit of the Owner. If security deposits or other funds are required by law to be held in a segregated account and are, by law, allowed to be held by Manager, such deposits or funds shall be held in a separate account at said financial institution. However, if not required to be separated, manager may hold security deposits in Manager's Trust Account and Owner agrees that Manager retains the authority to utilize security deposits to pay for operating expenses of the Project. The use of security deposits does not negate the Owner's

– 3 –

obligation to refund security deposits in accordance with the terms of the resident leases and to ensure that sufficient funds are available to Manager at all times to make appropriate refunds. Manager may allow Manager's Broker to authorize a licensed or unlicensed person in direct employment of the broker, pursuant to A.R.S. ' 32-2174, subsection C, to transfer monies from or to be a signatory on manager's Trust Account to which the property management firm deposits the owner's monies. Checks written over $10,000 are subject to additional internal review before release. Disbursements of excess funds to Owner will be made no later than 25 (twenty-five) days after the month following collection of the funds.

5.   FINANCIAL REPORTS. Manager shall prepare and furnish to Owner monthly financial reports, within twenty-five (25) days after the end of each calendar month. Said reports shall include a detailed statement of all cash received and disbursements made during both the preceding month and cumulatively for the period from the beginning of the year through the end of said month in connection with the operation of the Property, together with such supporting schedules as may be required by Owner, including without limitation, rent rolls and a list of security deposits showing the amount of security held for each unit and a summary of disbursements by vendor.

6.   INDEMNITIES: WAIVER OF SUBROGATION.

(a)   Owner shall indemnify, defend and hold Manager harmless from and against all claims, damages and costs (including reasonable attorney's fees and costs) incurred by Owner and arising out of or in connection with the management of the Property and the operation thereof, except for (i) all acts of Manager, its agents or officers, that are outside the scope of Manager's employment hereunder and (ii) the negligence or willful misconduct of Manager, its agents, or officers (collectively "Unauthorized Acts").

(b)   Each party hereby waives any and all rights of recovery or claims against the other, or the officers or employees thereof, for any loss or damage suffered by the waiving party to the extent that such loss or damage is covered by any insurance policy in effect at the time thereof. Each party shall, when obtaining the insurance required by this Agreement, give the company issuing such insurance, together with any other companies insuring such party, notice of the waiver of subrogation set forth herein and shall obtain appropriate endorsements with respect thereto from each such company and shall deliver copies thereof to the other party.

7.   LIABILITY INSURANCE. Owner shall during the term of this Agreement carry public liability insurance, which may be provided under an umbrella policy. The limits of liability thereunder shall be no less that $1,000,000.00 combined single limit. Owner shall name the Manager as an additional insured under the public liability insurance policy and provide the manager with a copy of all such policies and endorsements.

8.   MANAGER'S COMPENSATION; MANAGER'S NON REIMBURSABLE EXPENSES.

(a)   In consideration of the performance of its management and leasing duties hereunder, Owner shall pay to Manager during the term of this Agreement a monthly fee of 4% of the gross income (as hereinafter defined) actually collected by manager for Owner's account during the preceding month, until the termination of this Agreement. "Gross Income" shall mean payments actually collected from tenants of the Property, exclusive of (i) operating expense payments collected in excess of fixed rents on account of real estate taxes, operating expenses, or similar costs, (ii) any rental or use taxes collected from resident. Manager is permitted to retain application fees collected from prospective residents.

(b)   The salaries, wages and other compensation (including, without limitation, social security taxes and workers' compensation insurance) of all Manager's employees, other than those working exclusively at the Property and those who are maintenance personnel, shall be paid by Manager without reimbursement by Owner.

(c)   The salaries, wages and other compensation (including, without limitation, social security taxes, workers' compensation insurance and health insurance) of Manager's employees working exclusively at and for the benefit of the Property shall be paid by Manager and reimbursed by Owner as an operating expense of the Property.

(d)   Manager may use Manager's own maintenance employees who do not work exclusively at and for the benefit of the Property at the Property and may bill their time at an hourly rate.

– 4 –

9. COMMUNICATIONS FROM THIRD PARTIES. Manager shall advise Owner immediately by telephone or email, with prompt confirmation by mail (including the sending of the document received by Manager), of the service upon Manager of any summons, subpoena or similar legal document, or of the receipt by Manager of any notices, letters or other communications setting forth or claiming any actual or alleged potential liability of Owner or the Property, including, without limitation, any notice, demand, request or other communication from any resident of the Property or any mortgagee, deed of trust beneficiary, ground lessor or insurer.

10. DAMAGE OR DESTRUCTION. Manager shall promptly notify Owner of any damage to or destruction of the Property in excess of $5,000.00. In the event of any damage or destruction to any part of the Property, Manager, in addition to the other duties enumerated herein, shall inspect, monitor and supervise all reconstruction or repair work on a periodic basis to ensure that the Property is being repaired orderly, efficiently and in a manner approved by Owner, and shall advise and consult with Owner at such times as Owner shall request with respect to such reconstruction or repair. If the cost of repair or reconstruction is projected to be less than or equal to the sum of $5,000.00, as reasonably estimated by Owner, then Manager shall perform the duties enumerated in this paragraph without payment to it by Owner of any consideration in addition to that amount described in paragraph 8. If however, the reasonably estimated cost of repair or reconstruction is in excess of the aforementioned sum, then Manager shall perform the duties enumerated in this paragraph and Owner shall pay to Manager as additional consideration to that described in paragraph 8 an amount reasonably determined by Owner. Said amount shall be payable per month until (i) the repair work has been substantially completed or (ii) Owner notifies Manager that such additional duties are no longer required, whichever occurs first.

11. SALE OF PROPERTY. Manager agrees to cooperate with Owner in connection with any such sale of the property or related negotiation and shall provide to a prospective purchaser such information and/or documentation as is reasonably requested by Owner. Manager further agrees that it will not by any act of commission or omission impede any sale or related negotiation. No provision herein shall be deemed as authorization to Manager to act as broker in connection with the sale of the Property or to entitle Manager to a commission or fee upon the sale of the Property unless otherwise expressly agreed upon in writing by Owner.

12. TERM OF AGREEMENT. This Agreement shall be for a period of time commencing **no later than** 10/1/18, at which time Manager will take management responsibility for all or any portion of the subject Property ("Commencement Date") and ending ——————, or upon the occurrence of an event specified below.

   (a) Sale of the Subject Property and transfer of management.

   (b) Upon the expiration of thirty days from the delivery of written notice of the termination from either party to the other.

   (c) Notwithstanding anything to the contrary in paragraph 11, and in addition to any other rights and remedies available to Owner and Manager at law or in equity, this Agreement may be terminated immediately by Owner or Manager without notice in the event of Manager's or Owner's breach of this Agreement.

   (d) Immediately upon termination of this Agreement, Manager agrees to provide owner with all records or documents in Manager's possession including rental agreements, property inventories, leases, pet permits, default notices, lease amendments or addenda. If these records are not in Manager's possession, Manager shall inform Owner in writing immediately as to the location of these records, if available. Within 5 days of the effective date of termination, Manager shall turn over to Owner a list of all tenant security obligations. Within thirty-five days, Owner shall receive reimbursement for all monies remaining in the property accounts maintained by Manager, except for monies needed for unpaid obligations incurred during the term of the property management agreement. Within seventy-five days, Owner shall receive a final accounting.

If not previously terminated, this agreement will automatically renew for a period of one (1) year at each anniversary of the above stated ending date.

13. ASSIGNMENT. This Agreement is personal to Manager and Owner. Manager and Owner agree that they shall not assign this Agreement or subcontract the performance of its duties hereunder without Owner's or Manager's prior written consent.

- 5 -

Any assignment or subcontracting without Owner's or Manager's such consent shall be void.

14. NOTICES. All notices required to be given by either party to the other hereunder shall be in writing and shall be sent by registered or certified mail, return receipt requested and postage prepaid, to the parties at the addresses set forth below on the signature page of this Agreement. Either party may at any time change its address by sending written notice to the other party in the manner hereinabove prescribed. All notices, demands and requests shall be deemed given, delivered or received upon the date of receipt or the date delivery was first refused by the addressee as shown on the return receipt.

15. OWNER'S REPRESENTATIVE. Owner shall designate one person as Owner's Representative (John Rish) for all communications and dealings with Manager. Owner hereby represents and warrants to Manager that Owner's Representative is authorized and shall have the sole authority to represent Owner with respect to the matters stated in this Agreement. Approval of Owner's Representative shall constitute Owner's approval with respect to the matters stated in this Agreement and Manager may rely on any directive of the Owner's Representative without further authorization or inquiry from Manager. Owner may change its Owner's Representative by providing written notice to Manager accompanied by such supporting documentation as Manager may reasonably request, including without limitation resolutions of Owner.

16. MISCELLANEOUS. *      *Addendum to Property Management Agreement is incorporated herein by reference.

   (a) This Agreement contains the entire agreement between the parties hereto, and any agreement hereafter made shall be ineffective to modify or terminate this Agreement or constitute a waiver of any of the provisions hereof unless such agreement is in writing and signed by the party against whom enforcement of the modification, termination or waiver is sought.

   (b) The captions to the paragraphs in this Agreement are included for convenience only and are not intended to and shall not be deemed to modify or explain any of the terms of this Agreement.

   (c) This Agreement shall be governed by and interpreted in accordance with the laws of the State of Arizona.

   (d) Manager shall comply with all statutes, ordinances, laws, rules and regulations, orders and requirements of any federal, state and local government or department having jurisdiction with respect to the use or leasing of the Property (in whole or in part) or the maintenance or the operation thereof, as well as all orders of the local Board of Fire Underwriters or any other body that may have similar functions.

IN WITNESS WHEREOF, this instrument has been duly executed as of the day and year first above written.

Manager:

Consolidated Asset Management, Inc.

By:_____

Its:_____

Address:

301 E. Bethany Home Road
Suite B-140
Phoenix, AZ 85012
(602) 957-4999

Owner:

By:_____

Its: _____

Address: 16409 S 22 w/ N AVE
PHOENIX AZ 85048

By:_____

Its: _____

Address: 16620 S 22 NO ST
PHOENIX AZ 85048

Tax ID No. _____

ADDENDUM TO PROPERTY MANAGEMENT AGREEMENT

1.  Whenever in this Property Management Agreement ("Agreement") there is a right of Owner to consent or to exercise general supervision and control over Manager or a requirement that Manager obtain the approval or authorization of Owner, such consent, direction, approval or authorization means the joint written consent, direction, approval or authorization of Franciszek Janowiak and Elzbieta Janowiak.

2.  With respect to paragraph 4 of the Agreement, the "request" of Owner means the joint written request of Franciszek Janowiak and Elzbieta Janowiak.  All funds shall remain in the Manager's Trust Account for use by Manager in accordance with this Agreement, and to the extent that there are surplus funds, Manager is directed that such surplus funds shall be used thereafter: (a) first to pay the monthly mortgage on the personal residence occupied by Elzbieta Janowiak;  and then (b) remitted or disbursed to each of Franciszek Janowiak and Elzbieta Janowiak by separate checks on a 50/50 basis, each month.

3.  All financial and other reports and notices from Manager to Owner shall be sent simultaneously to Franciszek Janowiak and Elzbieta Janowiak.

4.  Paragraph 15 of the Agreement is deleted.

5.  Manager and Owner acknowledge and agree that this Agreement will not be amended or terminated by Owner nor can Owner waive any right under this Agreement, unless such amendment, termination or waiver is in writing evidenced by the joint written approval of both Franciszek Janowiak and Elzbieta Janowiak.

6.  The address of Elzbieta Janowiak for all purposes under this Agreement is P.O. Box 94994, Phoenix, AZ 85072.

EXHIBIT 4

1

THE KOZUB LAW GROUP, PLC
Richard W. Hundley, #019829
2   7537 East McDonald Drive
Scottsdale, Arizona 85250
3   mewak@kozublaw.com
(480) 624-2700
4

Attorneys for Defendants
5

6            UNITED STATES DISTRICT COURT

7                DISTRICT OF ARIZONA

8

Shannon Truong, an Arizona resident,      Case No.  CV19-5398-PHX-DLR
9

10                  Plaintiff,              **DEFENDANTS'/
COUNTERCLAIMANT'S
11   v.                                     MANDATORY INITIAL
DISCOVERY RESPONSES**
12   Garden View Townhomes, LLC, an
Arizona company; and Franciszek           (Assigned to the Hon. Douglas L. Rayes)
13   Janowiak, an Arizona resident,

14                  Defendants.
15

16        Defendant, Garden View Townhomes, LLC, an Arizona limited liability company,

17   and Defendant and Counterclaimant, Franciszek Janowiak, hereby provide their

18   Mandatory Initial Discovery Responses as follows:

19

20             **MANDATORY INITIAL DISCOVERY RESPONSES**

21        **1.     State the names and, if known, the addresses and telephone numbers of**

22   **all persons who you believe are likely to have discoverable information relevant to**

23   **any party's claims or defenses, and provide a fair description of the nature of the**

24   **information each such person is believed to possess.**

25

26        **Response:**   Claimant believes the following individuals are likely to have

27   discoverable information relevant to any party's claims or defenses:

28

1

1.      Franciszek Janowiak, c/o Defendants' attorney herein.  Mr. Janowiak is the manager and member of Co-Defendant, Garden View Townhomes, LLC.  Mr. Janowiak will testify to his ownership and the operation of the Garden View Townhomes, LLC, until its sale in October 2019.  He will testify to the Independent Contractor Agreement entered into with Plaintiff, its terms, and the duties required of her.  He will testify Plaintiff's duties were primarily to collect rent when he was not present, and accept rental applications and show units available for rent when there were vacancies and when he was not present to do so.  There were other minimal duties, all of which combined were anticipated by the parties to require of Plaintiff no more than an hour a day, at most two hours on occasion, and ten hours in total a week.  In exchange, Plaintiff received an apartment unit within which she and her family could reside at no cost, and with a rental value, in recent years, in excess of $1,000 a month.  Mr. Janowiak will also testify in response to the allegations raised by Plaintiff in her Complaint.  Mr. Janowiak will also testify in September 2019 he discovered Plaintiff had wrongfully accessed three credit card accounts of his to make purchases and cash advances in his name, and without his knowledge, information, or consent and which led to her termination.  He will testify to Plaintiff's wrongful acts, discovery of them, and the total amount of the unauthorized transactions.

2.      Shannon Truong, c/o Plaintiff's attorney herein.  Ms. Truong will be asked to testify to the Independent Contractor Agreement, the duties required of her, and the amount of hours involved.  She is expected to confirm she was not on call for 12 hours a day, or at all, as she alleges in her Complaint, and her duties required only about ten

hours a week of her time which she could perform at times selected by her and according to her schedule.  She is expected to confirm she was not required to be onsite at the apartment complex at any time and could leave the complex for work or for any reason. She will also be asked to testify to her wrongful use of Mr. Janowiak's credit card accounts and preparation of falsified statements to avoid detection.

3.    Elzbieta Janowiak, 16160 South 50th Street, No. 135, Phoenix, Arizona 85048.  Elzbieta Janowiak is the now former spouse of Franciszek Janowiak.   Ms. Janowiak is expected to testify to her role in the management and operations of the Garden View Townhomes and is expected to address the duties required of Plaintiff under the Independent Contractor Agreement and the limited hours Plaintiff worked.  She will confirm Plaintiff was neither on call nor required to be on call at any time.  Ms. Janowiak will also testify Plaintiff informed her she had other employment, including driving for Uber.

4.    Patrick Janowiak, 16160 South 50th Street, No. 135, Phoenix, Phoenix, Arizona 85048.  Patrick Janowiak is Franciszek and Elzbieta Janowiak's adult son. Patrick will testify he was present on frequent occasions at the Garden Homes Townhomes, will confirm his father's daily management of the complex, and will testify as to the minimal duties undertaken by and hours required of Plaintiff.

5.    Jessica Green, of Consolidated Asset Management, also known as CAM Properties, 301 East Bethany Home Road, Suite B-140, Phoenix, Arizona 85012. Telephone number 602-957-4999.  Ms. Green is an employee of CAM Properties.  She will testify as a result of the Janowiaks' 2018 dissolution of marriage proceeding, CAM

Properties was appointed by the court to manage the Garden View Townhomes for the three-month period of October 2018 through December 2018. She will testify she acted as the manager for these months. She will testify Plaintiff, at Mr. Janowiak's request, was allowed to continue her role with the Garden View Townhomes. She will confirm she determined, with Plaintiff, the duties required of Ms. Truong did not exceed ten hours a week and Ms. Truong was accordingly paid for ten hours of work a week.

6.    Robert Hernandez, Vice President of JPMorgan Chase Bank, 15635 South Desert Foothills Parkway, Phoenix, Arizona 85048. Telephone number 480-460-3015. Mr. Hernandez will testify to an event in or about September 2019 when Plaintiff, without authorization, attempted to transfer funds from a Defendant's bank account to her bank account in the amount of $3,300. He will testify Ms. Truong was not an authorized user of the account from which she sought to withdraw the funds. He stopped the transaction and so informed Mr. Janowiak.

7.    Ryan McComock, address to be provided. Telephone 480-233-8690. Mr. McComock is a former resident of the Garden View Townhomes, residing in Apartment 23 for ten years. He moved in 2017. He will testify to his observations of Ms. Truong's work, that her activities were minimal as to their nature and time involved. He will testify she was not "on call" as she alleges.

8.    Jesus Cantu, 524 South Stapley Drive, Apartment 2, Mesa, AZ 85204. Telephone 480-295-6919. Mr. Cantu has resided in the Garden View Townhomes for at least four years. He will testify to his interactions with Plaintiff and observations of her

4

work activity.  He will confirm her efforts were minimal as to their extent and time required.  He will confirm Plaintiff was not "on call" and was not always present.

9.     Jared Carter and/or Brittany Strugill, both at 524 South Stapley Drive, Apartment 22, Mesa, Arizona 85204.  Telephone number 602-579-4420.  Mr. Carter and Ms. Strugill have resided in the Garden View Townhomes for the past four years.  They will testify to their interactions with Plaintiff and observations of her job duties.  They will confirm Plaintiff's work was minimal in nature and extent.  They will confirm Plaintiff was not "on call."

10.     Kazimierz Kania, address to be provided.  Telephone number 602-486-7133.  Mr. Kania is a contractor who provided work to the Garden View Townhomes.  In 2017, he remodeled ten apartments.  He also repaired the siding and painted all units.  He was onsite for at least three months with a work crew.  He will testify to his observations of Plaintiff's job duties, his interactions, or lack thereof, with her.  He will testify Plaintiff was not always present at the complex.  He will testify to occasions when he needed keys to access a unit and Ms. Truong was not present.

11.     A representative of Discover Bank, P.O. Box 51908, Los Angeles, California 90051.  The representative will be called to testify to the existence of Mr. Janowiak's credit card account, to verify monthly statements, to identify falsified monthly statements, and to confirm charges made on the account.  The representative will also testify to notification received from Mr. Janowiak of the unauthorized usage of the account.

12.     A representative of Citi, c/o P.O. Box 78045, Phoenix, Arizona 85062.  The representative will be called to testify to the existence of Mr. Janowiak's credit card account, to verify monthly statements, to identify falsified monthly statements, and to confirm charges made on the account.  The representative will also testify to notification received from Mr. Janowiak of the unauthorized usage of the account.

13.     A representative of JPMorgan Chase Bank, c/o P.O. Box 15298, Wilmington, Delaware 19850.  The representative will be called to testify to the existence of Mr. Janowiak's credit card account, to verify monthly statements, and to confirm charges made on the account.  The representative will also testify to notification received from Mr. Janowiak of the unauthorized usage of the account.

14.     Jay Wu, 524 South Stapley, Apartment 15, Phoenix, Arizona.  Mr. Wu is Ms. Truong's husband and has resided with her in the Garden View Townhomes, but for several years when he was incarcerated.  The nature and extent of Mr. Wu's testimony is not known but will be asked to testify to Ms. Truong's work or employment history and his knowledge of Plaintiff's unauthorized usage of Mr. Janowiak's credit card accounts.

15.     Defendant/Counterclaimant may also call some or all of those witnesses disclosed in Plaintiff's Mandatory Initial Discovery Responses, including current and former residents of the Garden View Townhomes who will be asked to testify to their observations, regarding Plaintiff's work duties and time expenditure.

**2.      State the names and, if known, the addresses and telephone numbers of all persons who you believe have given written or recorded statements relevant to any party's claims or defenses.   Unless you assert a privilege or work product**

protection against disclosure under applicable law, attach a copy of each such statement if it is in your possession, custody, or control. If not in your possession, custody, or control, state the name and, if known, the address and telephone number of each person who you believe has custody of a copy.

**Response:** In or about September 2019, Franciszek Janowiak provided a statement to the Phoenix Police Department, the "Embezzlement Reporting Packet," Report No. 2019-00001633464, a copy of which is provided herewith.

3.      List the documents, electronically stored information ("ESI"), tangible things, land, or other property known by you to exist, whether or not in your possession, custody or control, that you believe may be relevant to any party's claims or defenses. . . . Include in your response the names and, if known, the address and telephone numbers of the custodians of the documents, ESI, or tangible things, land, or other property that are not in your possession, custody, or control. . . .

**Response:**

1.      Independent Contractor Agreement, dated May 1, 2015

2.      Independent Contractor Agreement, dated May 1, 2015, with interlineation

3.      Independent Contractor Agreement, dated May 1, 2015, with interlineation

4.      Independent Contractor Agreement, January 1, 2018, through December 31, 2018

5.      Independent Contractor Agreement, August 1, 2018

6.      Plaintiff's Driver's License and Social Security Card

7.      Plaintiff's W-9 Form

8.      September 11, 2017, letter

9.      December 20, 2017, letter

10.     Return Hearing, Rule 69 Agreement, et al., filed October 1, 2018

11.     Property Management Agreement, dated September 25, 2018

12.     Garden View Townhomes Financial Reports for the Month of October 2018

13.     Garden View Townhomes Financial Reports for the Month of November 2018

14.     Garden View Townhomes Financial Reports for the Month of December 2018

15.     Embezzlement Reporting Packet

16.     Ink from Chase, Account Statement, closing date February 2, 2019

17.     Ink from Chase, Account Statement, closing date March 2, 2019

18.     Ink from Chase, Account Statement, closing date April 2, 2019

19.     Discover Card, Account Statement, closing date July 10, 2019

20.     Discover Card, Account Statement, closing date July 10, 2019, allegedly falsified by Plaintiff

21.     Discover Card, Account Statement, closing date August 10, 2019

22.     Discover Card, Account Statement, closing date August 10, 2019, allegedly falsified by Plaintiff

23.     Discover Card, Account Statement, closing date September 10, 2019

24. Discover Card, Account Statement, closing date October 10, 2019

25. CitiBusiness Card, Monthly Account Statements, January 24, 2019, through June 26, 2019 (7)

26. CitiBusiness, Account Statement, closing date April 24, 2019, allegedly falsified by Plaintiff

27. CitiBusiness, Account Statement, closing date June 26, 2019, allegedly falsified by Plaintiff

28. Lease Agreements with Plaintiff

29. All documents identified in Plaintiff's Mandatory Initial Discovery Responses

30. Additional Chase Bank, Discover, and Citi Bank Account Statements of Mr. Janowiak

Documents 1 through 27 are provided herewith. Documents 28 and 30 are not currently in these parties' possession, custody, or control.

**4.      For each of your claims or defenses, state the facts relevant to it and the legal theories upon which it is based.**

**Response:**      Defendant Garden View Townhomes, LLC, an Arizona limited liability company, owned a 28-unit apartment complex located at 524 South Stapley Avenue, Mesa, Arizona. Defendant Franciszek Janowiak ("Janowiak") and his now former spouse, Elzbieta Janowiak, acquired the apartment complex in March 2002. They transferred title to Garden View Townhomes, LLC, in January 2012. Mr. Janowiak was the owner of Garden View Townhomes, LLC, and the complex's

manager.  Mr. Janowiak actively managed the complex and was physically present six, and at times seven, days a week.  Elzbieta Janowiak, before the parties' separation, assisted in the management of the complex.

Plaintiff, Shannon Truong, beginning in approximately 2012, was a tenant, occupying Apartment 15 with her husband, Jay Wu.  In or about May 2015, Ms. Truong asked Mr. Janowiak if she could assist him with the Garden View Townhomes' operations.  She had recently had a baby, and sought an arrangement where she could stay at home with her infant yet provide some economic benefit to the family.

Mr. Janowiak's years of operations of the Garden View Townhomes found there to be occasions when a tenant wished to pay rent or a potential tenant wished to see a vacant apartment when he was unavailable.  Therefore, Mr. Janowiak agreed Ms. Truong could provide assistance in exchange for, at first, a partial rent credit, and soon after, a full rent credit.  On May 1, 2015, the parties entered into an Independent Contractor Agreement which gave Ms. Truong, then using the name of Shannon Wu Gana, a $200 rent credit.  After one month, the agreement was changed with Plaintiff extended a half-month rent credit plus $100.  By August 2016 this arrangement was changed again to free rent from August 2016 and thereafter.

Each of the Independent Contractor Agreements identified Plaintiff as an independent contractor and included the following:  "The owner acknowledges that the independent contractor is free to set his own work schedule related to work performed."

There were no specific hours required of Ms. Truong.  She was not required to be on call or present at the apartment complex at any particular time.

The Independent Contractor Agreement identified Ms. Truong's duties as follows:

    a.    Show apartments when vacant.

    b.    Watch for general safety of complex.

    c.    Daily pool duties as discussed (clean, etc.).  Unlock 9:00 a.m. close 9:00 p.m.

    d.    General property cleanup.

    e.    Turn gate off before storm.

It was discussed and agreed these duties would require of Ms. Truong no more than an hour a day, perhaps two hours if there were multiple applicants interested in a vacancy.  The parties estimated her duties would take no more than ten hours a week, approximately 40-45 hours a month.

The time required of Ms. Truong to accept a rent check or cash payment if Mr. Janowiak was not present would be a matter of minutes each month.  Most tenants resided in the Garden View Townhomes for three to five-year periods, many for ten years of more.  There were many months were there were no vacancies.  There were many months where there was no more than one vacancy which was generally quickly filled.  Therefore, the time required to take rental applications and show apartments was also minimal.

The Independent Contractor Agreement's reference to "daily pool duties" was only in the event Mr. Janowiak was not present and able to clean the pool.  Plaintiff, perhaps once, and at most twice a month, would sweep the pool which would take

11

approximately 20 minutes.   Ms. Truong was not required to clean the complex but, rather, if she saw debris, should pick it up and throw it away.

Plaintiff was not required to be on call or to dedicate any specific hours.  She was also free to obtain other employment.  At some point after 2015, her husband, Jay Wu, lost his job as a police officer.  Defendants understand he was convicted and served a period of incarceration for felony sex related offenses performed when he was a police officer.   At that time, Plaintiff drove a vehicle for Uber and may have had other employment.

The value of the rental unit provided to Ms. Truong and her family at no charge exceeded a minimum wage for the hours worked and required of her.   The most recent rental value of Plaintiff's unit was $1,050 a month.

In 2018, Franciszek Janowiak and Elzbieta Janowiak separated and a Petition for Dissolution of Marriage was filed.  As a result, and for a three-month period, an outside manager was brought in pursuant to court order to manage the Garden View Townhomes.  Nancy Green of CAM Properties became the complex's manager for October through December 2018.  Mr. Janowiak asked Ms. Truong be allowed to continue her role with the complex.  CAM Properties agreed and determined, with Plaintiff, her duties required ten hours of work a week.  She was paid for ten hours of work.

CAM Properties also wanted to charge Plaintiff rent.  Mr. Janowiak interceded and asked CAM Properties not to charge Plaintiff.  When CAM Properties' management ended in January 2019, Mr. Janowiak and Ms. Truong returned to the terms of the

Independent Contractor Agreement.  Plaintiff was provided free rent in exchange for her ten hours of work.

As part of their divorce proceeding, the Janowiaks entered into a contract to sell the Garden View Townhomes.  The transaction closed in October 2019.  During the sales process, Mr. Janowiak discovered Plaintiff had obtained his credit card information and, without his knowledge or consent, made purchases and obtained cash advances in his name, believed to total in excess of $50,000.  It is believed Plaintiff first accomplished this through the unauthorized use of Mr. Janowiak's Ink From Chase account.  His monthly statement with closing date of February 2, 2019, included multiple charges which Mr. Janowiak did not recognize and which he did not make.  Mr. Janowiak native language is Polish.  He speaks English but with limitations.  He showed Ms. Truong the Ink From Chase account and the many unauthorized charges.  Ms. Truong offered to call Chase and report this usage.  She later told Mr. Janowiak she had spoken with Chase and was told it would investigate the situation which would take six months to a year.  She also said Mr. Janowiak would receive a new card.  The following month's statement, that with closing date of March 2, 2019, included more unauthorized and unidentified charges, including dozens of Amazon charges, several in excess of $1,000 each, and one over $2,000.  Ms. Truong again claims to have reported the unauthorized usage to Chase.  Mr. Janowiak paid those charges he did make.  The accumulated unpaid balance was in excess of $20,000.

Unauthorized charges then began to appear on Mr. Janowiak's CitiBusiness Card account, starting with the monthly statement with closing date of January 24, 2019.  Ms.

Truong again volunteered to contact Citi Bank and advise it of the unauthorized usage. She also told Mr. Janowiak she believed his wife, Elzbieta, was the source of the unauthorized credit card account activity.   Mr. Janowiak was led to believe by Ms. Truong the situation was resolved.   He stopped receiving monthly statements.   Ms. Truong provided to him online account statements which she contended confirmed the corrections, the deletion of the unauthorized charges.        But unbeknownst to Mr. Janowiak, Ms. Truong had changed the address for his credit card accounts, diverting them from his office at the Garden View Townhomes to her apartment, Unit 15.  She then falsified online statements to delete the changes she had made and presented the falsified statements to Mr. Janowiak which only reflected charges he had made.

By June 2019, Ms. Truong's conduct turned to Mr. Janowiak's Discover account, an account he had only opened earlier that year at Plaintiff's request because of the unauthorized usage of the other accounts.  Ms. Truong made sure the statements would be mailed to her.  She then altered the statements to only reflect purchases made by Mr. Janowiak.  As an example, the actual Discover account statement with closing date of July 10, 2019, shows total purchases of $3,882.68 that month.  The statement which Ms. Truong falsified and physically handed to Mr. Janowiak for that same month reflected purchases of $1,181.33, charges Mr. Janowiak had incurred.

Also in September 2019, Mr. Janowiak was contacted by his bank, JPMorgan Chase Bank.  The branch manager where Mr. Janowiak's accounts were opened advised him Ms. Truong had attempted a $3,300 transfer from a Defendant's bank account to her

own account.  This was stopped because Ms. Truong was not an authorized user of the account.

On September 20, 2018, with the close of escrow on the sale of the Garden View Townhomes soon to take place, Mr. Janowiak informed Ms. Truong her services were no longer required.  Mr. Janowiak told Ms. Truong he was aware of her wrongful conduct. Mr. Janowiak also at or about that time reported the unauthorized credit card usage to the Phoenix Police Department who later assigned the matter to the Mesa Police Department.

Once Ms. Truong learned her wrongful acts had been discovered, she brought this instant Complaint, filed October 14, 2019, under the Federal Labor Standards Act and Arizona law, falsely contending she worked seven days a week, twelve hours a day.  As set forth above, the work required of Ms. Truong was minimal and did not require more than ten hours of work a week which was fully and fairly compensated through the free rental unit provided to her family and to her.

As a result of these wrongful acts, Mr. Janowiak, as Counterclaimant, has asserted claims for conversion, unjust enrichment and under A.R.S. § 13-2314.0001, a statutory claim seeking recovery for unlawful acts.

In addition to the Counterclaim, Defendants have asserted affirmative defenses. Defendants assert an affirmative defense of estoppel pursuant to *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 475 F.Supp. 630 (1979), and directed to Plaintiff's claim for overtime pay on the grounds Plaintiff was not to work more than ten hours a week but, if she did, she is estopped from seeking overtime pay because of her failure to account for and report the hours she actually worked.

Defendants also assert to the extent allowable under Fair Labor Standards Act and other applicable law a setoff as and against amounts sought by Plaintiff, exclusive of minimum wage recovery, as a result of her wrongful conduct, her unauthorized use of Mr. Janowiak's credit card statements.

Defendants also assert an affirmative defense of Plaintiff's unclean hands to the extent Plaintiff seeks an amount in excess of a minimum wage and specifically directed to her claims for statutory penalties and/or punitive damages and attorneys' fees, each of which requires the Court to consider the conduct of all of the parties.

**5.    Provide a computation of each category of damages claimed by you, and a description of the documents or other evidentiary material on which it is based, including materials bearing on the nature and extent of the injury suffered. You may produce the documents or other evidentiary materials with your response instead of describing them.**

**Response:**   Defendants seek a finding Plaintiff recover nothing by way of her Complaint.   Plaintiff was an independent contractor as set forth in the Independent Contractor Agreements entered into by the parties which allowed her to set her own work schedule.   The tasks required of her, primarily to receive rent payments and rental applications. and to show available units, required minimal time which was agreed to be 10 hours a week.   The value of the rental unit provided to her was most recently in excess of $1,050 a month.

Mr. Janowiak, as Counterclaimant, seeks recovery against Ms. Truong for her wrongful use of his credit card statements.

A detailing of the actual unauthorized credit card charges is set forth in the Embezzlement Reporting Packet, Exhibit 15.

As to the Chase account, the loss is calculated to be $21,185.94.

As to the CitiBusiness account, the loss is calculated to be $22,484.07.

As to the Discover card account, the loss is calculated to be $8,413.65.

The total gross amount of damages, therefore, sought is $52,083.66, and to be trebled pursuant to A.R.S. § 13-2314.04(A).

This amount may be subject to reduction. Ms. Truong's wrongful use of Mr. Janowiak's credit card accounts also included her taking of cash advances. It may be she used a cash advance obtained from one account to make a partial payment on another account to avoid or delay discovery. Mr. Janowiak is also attempting to obtain a release of liability as to these charges from the credit card carriers.

Ms. Truong's husband, Jay Wu, is named as a Defendant as to the Counterclaim under A.R.S. § 25-214.

Defendants and Counterclaimant also seek an award of attorneys' fees and costs incurred.

6. **Identify and describe any insurance or other agreement under which an insurance business or other person or entity may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse a party for payments made by the parties to satisfy the judgment. You may produce a copy of the agreement with your response instead of describing it.**

**Response:**  Defendants/Counterclaimants are not aware of any insurance policy or other agreement applicable to Plaintiff's claims.

7.    **Notice:    A party receiving a list described in paragraph 3, the description of materials identified in paragraph 5, or a description of agreements referred to in paragraph 6 may request more detail or thorough responses due to mandatory discovery requests if such party believes the responses are deficient.  A party may also serve requests pursuant to Rule 34 to inspect, copy, test, or sample any or all of the listed or described items, to the extent not already produced in response to these mandatory discovery responses, or to enter onto designated land or other property identified or described.**

DATED this _____ day of December, 2019.

THE KOZUB LAW GROUP, PLC

By: _____
Richard W. Hundley
7537 East McDonald Drive
Scottsdale, Arizona 85250
Attorneys for Defendants

Copy of the foregoing mailed
this ____ day of December, 2019, to:

Michael Zoldan
Jason Barrat
Zoldan Law Group, PLLC
14500 N. Northsight Blvd., Ste. 133
Scottsdale, AZ 85260
Attorneys for Plaintiff

18

VERIFICATION

STATE OF ARIZONA    )
                       ) ss.
County of Maricopa    )

The undersigned, Franciszek Janowiak, individually and as agent and representative of Garden View Townhomes, LLC, has read the foregoing Mandatory Initial Discovery Responses and the facts set forth therein are true to the best of my knowledge, except as to those matters alleged on information and belief and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of Arizona the foregoing is true and correct.

_____
Franciszek Janowiak

19

EXHIBIT 5

**The Kozub Law Group, PLC**
Richard W. Hundley, #19829
7537 East McDonald Drive
Scottsdale, Arizona 85250
mewak@kozublaw.com
(480) 624-2700

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Shannon Truong, an Arizona resident, | Case No. 2:19-CV-05398-DLR |
| Plaintiff, | **DEFENDANTS' ANSWERS TO PLAINTIFF'S SECOND SET OF REQUESTS FOR NON-UNIFORM INTERROGATORIES** |
| v. | |
| Garden View Townhomes, LLC, an Arizona company; and Franciszek Janowiak, an Arizona resident, | (Assigned to the Hon. Douglas L. Rayes) |
| Defendants. | |
| AND RELATED COUNTERCLAIM | |

Defendants, Garden View Townhomes, LLC, an Arizona limited liability company, and Franciszek Janowiak, hereby respond to Plaintiff's Second Set of Requests for Non-Uniform Interrogatories, served and dated February 5, 2020, as follows:

## ANSWERS TO NON-UNIFORM INTERROGATORIES

**INTERROGATORY NO. 11:** Do you contend that Plaintiff was an independent contractor for Defendants? If your answer is in the affirmative, identify all facts, information, and documents that show: 1) the degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon her managerial skill; 3) the alleged employee's investment in equipment or materials required for her task, or her

1

employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; and 6) whether the service rendered is an integral part of the alleged employer's business.

**RESPONSE:**   Defendants contend Plaintiff was an independent contractor retained to provide limited services to Defendant, Garden View Townhomes, LLC, as to its 28-unit apartment complex.  This independent contractor relationship is confirmed and evidenced by five separate written Independent Contractor Agreements, signed by Plaintiff as the Independent Contractor, and all of which were previously provided with Defendants'/Counterclaimant's Mandatory Initial Discovery Responses as Exhibits 1-5. Each of the five Independent Contractor Agreements specifically identified Plaintiff, who used, varyingly, as her name, Shannon Wu Gana, Shannon Wu, and Shannon Truong, as an independent contractor.

Each of the Independent Contractor Agreements included multiple references to the Plaintiff as an independent contractor and included, inter alia, the following:

> 3.    The owner acknowledges that the Independent Contractor is free to set his own work schedule related to work performed.
> 4.    Because the Independent Contractor is engaged in his own business, the Independent Contractor is not eligible for, and shall not participate in, any employer pension, health, or other fringe benefit plans for the client.
> 5.    The Independent Contractor agrees to complete the work to be performed in a manner generally acceptable to the industry in which he/she is being employed.  If the parties have agreed to any specification with regards to the job, they have attached such specification as an addendum to this agreement.

2

None of the Independent Contractor Agreements include the addendum referenced in paragraph 5.

(1)     The Defendants did not maintain the right to control the manner in which Plaintiff performed the work called for under the Independent Contractor Agreement. Plaintiff was free to set her own work schedule, to work those hours as selected by her, on the days selected by her, and only if work needed to be done which was at most limited and intermittent.  Plaintiff's primary function was to collect rents from tenants at times when Defendant Franciszek Janowiak, the onsite manager of the apartment complex, was not available.  Mr. Janowiak was generally available six days a week and would accept the rent payments and/or applications for new rentals when there was a vacancy.  If a tenant sought to pay rent when Mr. Janowiak was not present, the tenant could either drop the check through the mail slot on the door of the office used by Mr. Janowiak, or provide it to Plaintiff.  Plaintiff had sole control over her interactions with the tenants and the collection of rent.

(2)     Plaintiff did not have an opportunity for profit or loss depending on her skill or job performance or otherwise.  Rather, the agreed upon compensation for her independent contract services was to allow her a rent credit, ultimately the full amount of the rent for her unit in the Garden View Townhomes, unit 15, in which she resided before the independent contractor relationship began.

(3)     Plaintiff did not invest in equipment or materials.  There was no equipment or materials required for her tasks.  She was not required to and never did employ

helpers.  The issue of whether she needed helpers neither arose nor was ever discussed by the parties.

       (4)    The services required of Plaintiff did not require any special skills.

       (5)    The working relationship could be terminated by either party at its and/or her own discretion.

       (6)    The services provided by Plaintiff as part of the Independent Contractor Agreement were not integral parts of Garden View Townhomes, LLC's business.

**INTERROGATOR NO. 12:**  Identify all tenants of Defendants between May 1, 2015 through September 20, 2019.  A complete response will identify a) the tenants' name; b) the address, phone number, and email address when they lived on Defendants' property; c) the address, phone number, and email address after they lived on Defendants' property; d) who the tenants were instructed to contact to pay rent and/or if there were any issues with the property; e) any communication between Plaintiff and the tenants (including but not limited to emails, texts, and/or documents); f) when the tenants paid rent and to whom; and g) any written or oral policy instructing the tenants to contact Plaintiff for any reason.

**RESPONSE:**  (a)  There were 28 units within the Garden View Townhomes, LLC.  The names of the tenants, and the periods in which they so resided within the timeframe identified, are as follows:

| Unit | Tenant |
|------|--------|

1   Tenant Reyes resided from in or prior to May 2015 through September 2019.

2   Tenant Garcia resided from in or prior to May 2015 through September 2015.  Tenant Pacheco resided in the unit from November 2015 through March 2016.  Tenant Jesus Cantu resided from April 2016 through September 2019.

3   Tenant Tami Buehler resided from in or prior to May 2015 through September 2019.

4   Tenant Pierce resident from in or prior to May 2015 through June 2018.  Tenants Frank Elder and Venice Valdez resided in the unit from  September 2018 through September 2019.

5   Tenant Faulke resided from in or prior to May 2015 through September 2019.  Tenant Varela resided with Tenant Faulke until in or about 2018.

6   Tenant Ceballo resided from in or prior to May 2015 through September 2019.

7    Tenant Jeffrey Olson resided from in or prior to May 2015 through September 2019.

8   Tenant Ritter resided from in or prior to May 2015 through July 2016.  Tenants Vargas and Miranda resided in the unit from August 2016 through May 2019.   Tenant Gray resided from June 2019 to September 2019.

9   Tenants Clarissa Irizarry and Dolezal resided from in or prior to May 2015 to February 2018.  Tenant George Philips resided from March 2018 through September 2019 and was joined by Tenant Kayla Rummage in September 2018.

10   Tenant Shipley resided from in or prior to May 2015 through September 2019.

11   Tenant Varela resided from in or prior to May 2015 through October 2015.   Tenant DeLuca resided from November 2015 through

| Unit | Tenant |
|------|--------|
|      | September 2019. |

12  Tenants Miranda and Vasquez resided from in or prior to May 2015 through September 2019.

13  Tenant Lucia Montano resided from in or prior to May 2015 through September 2017.   Tenants Bryant and Tompkins resided from November 2017 through September 2019.

14  Tenant Beverly Slettbaugh resided from in or prior to May 2015 through September 2019.

15  Tenant Truong and, at times, her husband, Jay Wu, resided from prior to May 2015 through September 2019.

16  Tenant Morales resided from in or prior to May 2015 through July 2015.   Tenant Elisa Garcia resided from August 2015 through September 2019.

17  Tenant Hodge resided from in or prior to May 2015 through June 2018.   Tenants Baker and Boykin resided from July 2018 through September 2019.

18  Tenant Linda Freeman resided from in or prior to May 2015 through September 2019.

19  Tenant Kyle resided from in or prior to May 2015 through September 2019.

20  Tenants Ross and Bowers resided from in or prior to May 2015 through July 2016.   Tenant Ramirez resided from August 2016 through September 2019 and was joined by Tenant Sladden in July 2018.

21  Tenants Lugano and Avila resided from in or prior to May 2015 through September 2016.   Tenant Duchene resided from August 2016 to May 2018.   Tenants Robert White and Ashley Kyragh resided from June 2018 through September 2019.

22  Tenant Conner resided from in or prior to May 2015 through March 2018.  Tenants Brittany Sturgill and Jared Carter resided from April 2018 through September 2019.

| Unit | Tenant |
|------|--------|

23   Tenant Ryan McCornack resided from in or prior to May 2015 through October 2018.  Tenant Norma Lopez resided from November 2018 through August 2019.  Tenant Kendrick moved into the unit in September 2019.

24   Tenant Hainline resided from in or prior to May 2015 through July 2015.  Tenant Clancy resided from August 2015 through October 2015.  Tenant Jay Warren resided from November 2015 through February 2016.  Tenants Ferrente and Capri resided from April 2016 through September 2018.  Tenant Matthews resided from November 2018 through September 2019.

25   Tenants Miyamoto and Simmon resided from in or prior to May 2015 through September 2019.  Simmon vacated in or about July 2018.

26   Tenant Vosdoganes resided from in or prior to May 2015 through July 2015.  Tenant Delgado resided from August 2015 through March 2016.  Tenant Egger resided from April 2016 through March 2017.  Tenants Jay Ferrante and Meritt resided from April 2017 through September 2019.

27   Tenants Tyler and Howard resided from in or prior to May 2015 through February 2016.  Tenants Julie and Bryan Flores resided from March 2016 through September 2019.

28   Tenant James Koontz resided from in or prior to May 2015 through July 2017.  Tenant Hernandez resided from August 2017 to September 2019.

(b)   The address of each tenant for the period of time in which they resided in the Garden View Townhomes was 524 South Stapley Avenue, Mesa, Arizona, and to include the unit number, referenced above.

(c)     Responding party does not have the phone numbers or email addresses of the tenants either for when they lived at the Garden View Townhomes or, for those who vacated, after they moved.

(d)     The tenants were instructed to pay rent at the start of each month to Garden View Townhomes and either to Franciszek Janowiak or, if he was not present, to be left through the mail slot on the door of his office onsite.  The tenants were also told they could deliver the rent to Shannon Truong.  The tenants were instructed if they had any issues to contact Mr. Janowiak or, if he was unavailable, Ms. Truong.

(e)     Objection, vague and ambiguous.  Without waiving said objection, responding party is not aware of the communications between Plaintiff and the tenants.

(f)     The tenants were to pay rent generally at the start of the month although several were allowed to make the payment by the third of the month or other date.  They were to pay the rent, as indicated above, to Mr. Janowiak, or to slip it through the mail slot of the door to the onsite office, or to provide it to Ms. Truong.

(g)     There was no oral or written policy.

DATED this _5th_ day of March, 2020.

THE KOZUB LAW GROUP, PLC

By: _____
     Richard W. Hundley
     7537 East McDonald Drive
     Scottsdale, AZ 85250
     Attorneys for Defendants

1   Original of the foregoing mailed
2   this 5th day of March, 2020, to:

3   Michael Zoldan
    Jason Barrat
4   Zoldan Law Group, PLLC
5   14500 N. Northsight Blvd., Ste. 133
    Scottsdale, AZ 85260
6   Attorneys for Plaintiff

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFICATION

STATE OF ARIZONA      )
                      ) ss.
County of Maricopa    )

The undersigned, Frank Janowiak, individually and as manager and member of Garden View Townhomes, LLC, has read the foregoing Responses to Plaintiff's Second Set of Requests for Non-Uniform Interrogatories and the facts set forth therein are true to the best of my knowledge, except as to those matters alleged on information and belief and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of Arizona the foregoing is true and correct.

_____
Frank Janowiak